**Marsha JANDRO, Administratrix of the Estate of Robert Dean Jandro, Deceased, Plaintiff–Appellant,**

v.

**OHIO EDISON COMPANY, Defendant,**

**L.E. Myers Company, Defendant–Appellee.**

No. 98–3034.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 16, 1998.

Decided Feb. 5, 1999.

Harry T. Quick (argued and briefed), E. John Brzytwa (briefed), Kevin M. Young (briefed), Martindale, Brzytwa & Quick, Cleveland, OH, for Appellant.

Irene C. Keyse–Walker (argued and briefed), Lois J. Cole (briefed), Arter & Hadden, Cleveland, OH, for Appellee.

Before: MERRITT, NORRIS, and GILMAN, Circuit Judges.

## OPINION

RONALD LEE GILMAN, Circuit Judge.

Robert Jandro was an electrical utility lineman for the L.E. Myers Company. On May 14, 1994, he was electrocuted while performing his job at a project in Twinsburg, Ohio. Marsha Jandro, Robert Jandro's wife and administratrix of his estate, brought an intentional tort suit against Myers and against Ohio Edison, the company for whom Myers was performing the work. Ohio Edison was subsequently dismissed as a defendant without prejudice, but the estate maintained its suit against Myers. The claim against Myers was based solely on an intentional tort theory because the Ohio Workers' Compensation Act, OHIO REV.CODE ANN. § 2745.01 (Anderson 1996), prohibits suits by an employee for work-related injuries based on negligence or recklessness. *See Blankenship v. Cincinnati Milacron Chemicals, Inc.*, 69 Ohio St.2d 608, 433 N.E.2d 572 (1982).

The district court granted Myers's motion for summary judgment, holding that the estate had failed to raise a genuine issue of material fact that would allow a jury to conclude that Myers had intentionally caused Jandro's death. The estate appeals. For the reasons set forth below, we **AFFIRM** the decision of the district court.

## I. BACKGROUND

The L.E. Myers Company is an electrical utility-line construction company located in Stow, Ohio. In April of 1994, Myers contracted with Ohio Edison to construct a new power line near Ohio Edison's substation in Twinsburg, Ohio. The construction of the new power line involved the rerouting of a 345,000 volt transmission line. In simplest terms, the goal of the project was to create a connection from the existing line to the Ohio Edison substation and back.

Work on the site began in May of 1994, led by foreman Roger Adams and project supervisor James Swank. They were jointly responsible for supervising a crew of thirteen workers, including Jandro. Jandro had been employed by Myers for seven years. He was an experienced electrician who had served as the foreman on other jobs.

Ohio Edison arranged for a power shutdown of the existing transmission line on May 13, 1994. When the Myers team arrived at the site that day, they did not hold a pre-work safety meeting as required by federal regulations. They did, however, discuss where the "grounds" were to be placed. Grounding is a key technique for dealing with potentially "hot" (i.e., energized) electrical lines. Even when electrical lines are de-energized, some electricity may remain in the lines. This is especially so where, as here, energized "crossover" lines can cause static

electricity in the de-energized line. As a result, workers must install grounds to bleed off the excess electricity. In order to ground a line, workers normally use a "hot-line tool," which is an insulated mechanical device that allows them to handle potentially live wires. No one disputes that the normal, safe way to ground a potentially live wire is to use a hot-line tool.

During the course of the project, Jandro and a co-worker, Jeff Sowards, were working on one of the electrical poles that the crew had just erected. They were standing in an uninsulated Manitex aerial lift (a type of truck with an extendable basket that enables electrical workers to reach overhead transmission lines) that had no working controls in the upper basket, thus requiring all movement to be controlled from the ground. Part of their task was to connect a block, an element of the electrical lines they were rerouting, to the new pole on which they were working. They discovered, however, that the hole in the block was covered by a clamp from one of the grounding wires.

The two men had not expected to find the hole covered, and thus had not placed in the basket the hot-line tool that would have allowed the safe movement of the grounding clamp. The two men discussed their options in light of the fact that Adams, the foreman, had repeatedly reprimanded linemen for coming down from the lines to retrieve tools. Despite Adams's potential displeasure, Sowards and Jandro agreed to return to the ground to retrieve the hot-line tool that was in their truck below. Because there were no working controls in the basket, Sowards waited for Jandro to radio to the operator on the ground to lower the basket. Sowards turned around to admire the view as he waited for the basket to be lowered.

Instead of radioing the operator, however, and unbeknownst to Sowards, Jandro attempted a procedure known as "sliding the ground." Jandro loosened the clamp with the screwdriver in his left hand while attempting to keep the clamp pressed against the block with his right hand. The deposition testimony of several co-workers indicated that this procedure, while dangerous, is sometimes used by experienced linemen.

Myers's safety guide does not explicitly prohibit "sliding," although it does require that workers use a hot-line tool when "placing or removing" grounds. In this case, the procedure had disastrous consequences when the clamp failed to stay in contact with the block. Because the basket was uninsulated, electricity in the line flowed through Jandro's body and into the basket.

Sowards immediately yelled for the basket to be lowered, but, inexplicably, the operator on the ground was some 150 feet away from his station. Overall, it took almost a minute for the basket to be lowered. When Jandro finally reached the ground, cardio-pulmonary resuscitation (CPR) was administered by Sowards and by an Ohio Edison inspector. They were unsuccessful, however, and Jandro died. Dr. Raymond Fish, a doctor hired by Jandro's estate, was of the opinion that Jandro's death could have been prevented if the basket had been lowered and CPR administered more quickly.

The estate brought an intentional tort action against Myers, alleging that conditions at the work site violated numerous OSHA regulations, including (1) the failure to hold a pre-work safety meeting, (2) the absence of personnel knowledgeable about emergency resuscitation, (3) the lack of an aerial lift having functioning upper and lower controls, and (4) the waiver of the rule that all electrical line work occur "between the grounds." The estate alleged that Myers had knowledge of these dangerous conditions and required its employees to continue working in spite of the substantial certainty that harm would occur. This, the estate claims, was sufficient to establish liability under *Fyffe v. Jeno's, Inc.*, 59 Ohio St.3d 115, 570 N.E.2d 1108 (1991), the Ohio Supreme Court's definitive pronouncement on intentional tort liability.

The district court granted Myers's motion for summary judgment, holding that the estate failed to produce sufficient evidence to establish that Myers had intended to harm Jandro. The estate now appeals.

## II. ANALYSIS

### A. Standard of Review

We review *de novo* the district court's grant of summary judgment. *See, e.g.,*

*Smith v. Ameritech,* 129 F.3d 857, 863 (6th Cir.1997). Summary judgment is appropriate when there are no issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. PRO. 56(C). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus.Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The judge is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial is presented when there is sufficient "evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252, 106 S.Ct. 2505.

We have jurisdiction in this case based on diversity of citizenship. *See* 28 U.S.C. § 1332. For the purposes of diversity jurisdiction, a federal court is in effect another court of the forum state, in this case Ohio, and must therefore apply the substantive law of that state. *See Mair v. C & O R.R..,* 851 F.2d 829, 832 (6th Cir.1988). *See generally Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

## B. Ohio's Intentional Tort Law

In most circumstances, an employee injured in the course of employment is limited to redress through the Ohio Workers' Compensation Act. OHIO REV.CODE ANN. § 2745.01 (Anderson 1996). The Workers' Compensation Act, although generally comprehensive, contains certain limited exceptions. One such exception exists for injuries resulting from an employer's intentional tort upon an employee.

The definitive Ohio case on the requirements for establishing an intentional tort claim against an employer is *Fyffe v. Jeno's, Inc.,* 59 Ohio St.3d 115, 570 N.E.2d 1108 (1991). The parties agree that *Fyffe* is the controlling law of this case. *Fyffe* requires that the plaintiff present evidence that (1) the defendant had knowledge of the existence of a dangerous condition, process, pro-

cedure, or instrumentality, (2) the employer knew with substantial certainty that the employee was likely to suffer harm, and (3) the employer required the employee to perform the job despite its knowledge of the danger. *See id.* at 1112.

These factors mean that evidence beyond that required to prove either negligence or recklessness is necessary to establish an intentional tort by an employer. In fact, it must be shown that the employer "(1) specifically desired to injure the employee; or (2) knew that injury to an employee was certain or substantially certain to result from the employer's act and, despite this knowledge, still proceeded." *Mitchell v. Lawson Milk Co.,* 40 Ohio St.3d 190, 532 N.E.2d 753, 756 (1988). It is not enough that the harm was likely to occur. *See Jones v. VIP Development Co.,* 15 Ohio St.3d 90, 472 N.E.2d 1046, 1051 (1984). Nor is it enough that there was a high risk of it occurring. *See Van Fossen v. Babcock & Wilcox Co.,* 36 Ohio St.3d 100, 522 N.E.2d 489, 504 (1988). Rather, it must have been substantially certain to occur. *See id.* After examining each of the *Fyffe* requirements in turn, we agree that Myers's conduct in this matter, though hardly exemplary, did not rise to the level of intentionality required by *Fyffe.*

### 1. Myers's knowledge of dangerous conditions

To prevail, the estate must present evidence that Myers knew of a dangerous condition, process, procedure, or instrumentality within its business operation. *See Fyffe,* 570 N.E.2d at 1112. The estate alleges that there were seven dangerous conditions at the work site. First, the estate claims that Myers failed to hold the on-site safety meeting as required by 29 C.F.R. § 1926.955(c)(2). It claims that if a formal meeting had been held at the site, the inadequate grounding procedures that contributed to Jandro's death could have been avoided. There is no dispute that the required meeting was not held.

Second, the estate alleges that none of Myers's employees on site held a valid CPR certificate as required by 29 C.F.R.

§ 1926.950(e)(1)(ii). If competent CPR had been performed, the estate alleges, Jandro's death would have been averted. Although Myers conceded that none of its employees had a valid certificate, it noted that an Ohio Edison inspector at the site was certified and helped administer CPR to Jandro.

Third, the estate claims that the basket on the aerial lift in which Jandro was standing was uninsulated, in violation of 29 C.F.R. § 1926.952(b)(2). The estate alleges that, had the basket been insulated, Jandro would not have been electrocuted. Myers responds, however, that lift baskets are required to be insulated only when linemen are working on *energized* lines. The text of the regulation confirms Myers's interpretation. The estate does not dispute that the lines were not energized, but claims that even if there was no regulatory violation, the uninsulated basket was nonetheless a dangerous condition.

Fourth, the estate claims that there was no operator at the base of the aerial lift when Jandro was electrocuted, and as a result it took considerably longer to lower him to the ground. Had there been an operator on the ground, the estate alleges, Jandro's prospects for survival would have improved. Myers does not dispute this fact.

Fifth, an electrical ground to the west of Jandro's position was removed shortly before the accident occurred. The estate alleges that the removal of this ground meant that Jandro was no longer working "between the grounds" as required by 29 C.F.R. § 1926.955(c)(3). Myers responds that 29 C.F.R. § 1926.954(f) states quite clearly that grounding at the work location itself (which was done) is an alternative to working between the grounds. The text of the regulation confirms Myers's interpretation. In its reply brief, the estate argues that even if Myers's interpretation of the regulation is correct, the removal of the ground was nonetheless a dangerous act.

Sixth, the estate claims that the foreman of the project rushed the workers in general and created a "my way or the highway" atmosphere for the entire job. Myers denied this, and pointed out that the record contains no support for this allegation. A review of the record confirms Myers's contention. The record indicates that while several of Myers's employees stated that Adams, the foreman, was concerned about working quickly, there is no evidence to support the claim that workers were unduly rushed or that there was a "my way or the highway" atmosphere.

Seventh, the estate alleges that the workers had not had a day off in several weeks and were tired. Myers denied this as well, again stating that the record contained no evidence to substantiate this allegation. A review of the record, however, confirms that Jeff Sowards testified that it had been several weeks since the crew's last day off.

Taking the evidence in the light most favorable to the non-moving party, it seems clear that there were several safety lapses at the Twinsburg work site. Although it appears that, contrary to the estate's claims, Myers had complied with federal regulations with regard to grounding procedures and the uninsulated lift, it is undisputed that the safety meeting was not held, the upper basket controls did not work, the basket operator was not in his assigned position, and the workers were not sufficiently trained in CPR.

The estate argues that these safety violations, taken together, created an unsafe workplace. Although the proximate cause of Jandro's death was his decision to slide the ground, each of the alleged violations may have in some way contributed to the fatal accident. We find ourselves unable to state with certainty whether an Ohio court would hold that an employer's knowledge of generally unsafe conditions, when those conditions did not proximately cause the harm at issue, would satisfy *Fyffe's* requirements. It appears that the Ohio courts have not squarely addressed this issue. Because we are able to resolve this case under the other prongs of the *Fyffe* analysis, however, we find it unnecessary to speculate as to what an Ohio court would do if confronted with this question. We will therefore assume, without deciding, that an Ohio court would allow an intentional tort case to go forward without allegations that the generally unsafe conditions were the proximate cause of the harm.

■ The remaining portion of the first prong of *Fyffe* requires a plaintiff to show not only the existence of a dangerous condition, but that the employer was *aware* of the dangerous condition. Myers asserts that, even if there were dangerous conditions at the site, it was not aware of them. Ohio law, however, charges Myers with constructive knowledge of these conditions if its supervisors were acting with "apparent agency." *See Stump v. Industrial Steeplejack Co.*, 104 Ohio App.3d 86, 661 N.E.2d 212, 216 (1995) (holding that the business owner's son, who was paid a higher rate than the other workers, used a company car, and instructed others at the work site, was acting with the apparent agency of the owner). It is beyond dispute in this case that Roger Adams, the foreman, and Jim Swank, the project supervisor, were acting with the apparent authority of Myers. Because both Swank and Adams were necessarily aware of these safety violations, Myers was constructively aware of them. For the purpose of this opinion, we will therefore assume that the estate has satisfied its burden under the first prong of the *Fyffe* test.

### 2. Substantial certainty of harm

■ For an employer to be liable for an intentional tort, it must not only know of the dangerous conditions, but those conditions must create a substantial certainty of harm. *See Fyffe*, 570 N.E.2d at 1112. This second prong of the *Fyffe* test holds that "the mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent." *Id.*

■ As set forth above, there were a number of potentially serious safety violations in this case. Even if Myers knew of and appreciated the risks, however, the violations involved were not substantially certain to cause an accident. The proximate cause of Jandro's electrocution was his decision to slide the ground. This risky procedure, although not specifically mentioned in Myers's safety guide, is clearly very dangerous. Myers's safety guide, moreover, prohibits the placing or removing of a ground without a hot-line tool. Despite the estate's argument to the contrary, it seems obvious that if it is dangerous to place or remove a ground without a hot-line tool, it is also dangerous to slide a ground without one.

Although the estate claims that Myers knew that linemen occasionally slid grounds, that at most proves knowledge of the risk. Furthermore, four of Jandro's co-workers on the project testified that sliding a ground was prohibited. The uncontradicted proof also established that no one at Myers knew in advance that Jandro would need to move the ground, much less that he would attempt to do so with his bare hands without using a hot-line tool. It therefore could not have been substantially certain that harm would occur.

■ Moreover, Myers actually took steps to alleviate the risk of electrocution by providing hot-line tools. Under Ohio law, an employer who provides the necessary safety equipment is excused from liability for the unexpected actions of an employee. *See McConville v. Jackson Comfort Sys., Inc.*, 95 Ohio App.3d 297, 642 N.E.2d 416, 420–21 (1994) (holding that where an employee failed to wear the ventilation mask he had been furnished and was injured by inhaling fumes, a grant of summary judgment for the employer on the employee's intentional tort claim was appropriate). In this case, had Jandro used the safety equipment provided to him, the accident would not have occurred. Jandro's decision not to retrieve the hot-line tool was inescapably his own.

The estate counters that Myers had a policy of rushing and pressuring its workers to the extent that they were required to forego proper safety procedures. In particular, the estate argues that Jandro feared the wrath of his foreman if he returned to the ground to retrieve the hot-line tool. There is, however, *no evidence in the record to support* this claim. While it may have been true that Jandro *thought* his foreman would be displeased, there is no evidence whatsoever that the foreman would in fact have been upset upon learning the facts, much less that he would have preferred that Jandro attempt to slide the ground and risk serious injury.

As a result, Myers cannot be said to have been substantially certain that an injury

would occur. We therefore concur with the conclusion of the district court that the estate has failed to prove that Myers was aware of a substantial certainty of harm to Jandro.

### 3. Required performance of dangerous duties

■ Even if death or serious injury had been a substantial certainty in this case, there is no evidence whatsoever that Myers ever required a lineman to slide a ground. The final element that the estate must prove to prevail, however, is that Myers *required* Jandro to continue with the dangerous activity despite its knowledge that death or serious injury was a substantial certainty. *See Fyffe*, 570 N.E.2d at 1112.

■ Myers's conduct fell far short of what is required by the third prong of *Fyffe*. The district court was correct when it wrote that "the intentional tort exception to the Workers' Compensation Act ... [encompasses] a particular scenario under *Fyffe:* one in which the employer is virtually certain that harm is about to occur but chooses to 'look the other way' in the interest of continuing the job. One might describe this scenario as one in which the employer takes a stance of 'active ignorance' or even 'willful blindness' in the face of an assured danger."

The lack of such an attitude by Myers is what distinguishes this case from a number of cases where the employer removed safety guards from industrial machinery. A typical example is *Taylor v. Triple A in the USA, Inc.*, 107 Ohio App.3d 14, 667 N.E.2d 999 (1995), where an employee was injured when her hand got caught in a hydraulic press whose guard had been removed by the employer. In that case, as in others cited by the estate, the court found that the employer's deliberate removal of the guard was sufficient to establish an intentional tort. The key point in *Taylor*, however, is that it was the employer who removed the guard and then required the employee to work on the unguarded machinery. In this case, it was Jandro himself who made the unilateral decision to slide the ground without the hot-line tool that was available at the job site.

Although the facts of this case are tragic, nothing in the record indicates that Myers's actions rose to the level of "active ignorance" or "willful blindness." The estate can show neither the certainty of harm, nor that Jandro was required to work in the face of such danger. In particular, there was no testimony that anyone required Jandro to slide a ground without using a hot-line tool. Myers's conduct at the job site may have been negligent; it may even have been reckless. But neither of these showings is enough to prove the existence of an intentional tort. The estate must therefore limit its claims against Myers to the benefits provided under the Ohio Workers' Compensation Act.

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the decision of the district court.