**MICHIGAN DESSERT CORP.,**
**Plaintiff–Appellant,**

v.

**A.E. STALEY MANUFACTURING**
**CO., Defendant–Appellee.**

No. 00–1436.

United States Court of Appeals,
Sixth Circuit.

Oct. 24, 2001.

Before KEITH, NORRIS, and BATCHELDER, Circuit Judges.

PER CURIAM.

Plaintiff-appellant Michigan Dessert Corp. ("MDC") appeals the district court's grant of summary judgment in favor of Defendant-appellee A.E. Staley Manufacturing Co. ("Staley") in a breach of warranty action arising from the purchase of starch to be used in a strawberry pie glaze. Because this is a diversity action, Michigan law governs on substantive issues, but federal law controls on procedural issues. *See Erie v. Tompkins,* 304 U.S. 64, 68, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see also Jandro v. Ohio Edison Co.,* 167 F.3d 309, 313 (6th Cir.1999). MDC raises three issues on appeal: (1) whether the district court erred in dismissing MDC's express warranty claims; (2) whether the district court erred in concluding that Staley had effectively disclaimed the implied warranty of fitness for a particular purpose; and (3) whether the district court erred in failing to consider MDC's common law breach of contract claim. For the reasons set forth below, we AFFIRM the district court's judgment.

## I. FACTUAL AND PROCEDURAL HISTORY

MDC is a food product development company that manufactures and markets a variety of dessert products that are sold to restaurants across the country. These dessert products primarily include powdered dessert mixes, puddings, pie fillings, and cakes. Staley is a manufacturer of food and industrial starch products. Staley also offers technical assistance to customers and non-customers by providing formulas for new products and recommending starches.

In late 1996, MDC decided to develop a strawberry pie glaze to market to potential customers. Leading this project was Richard Elias, President of MDC, and Minni Jaitly, MDC's Director of Research and Development. Soon thereafter, Denny's Restaurants ("Denny's") agreed to purchase MDC's strawberry pie glaze for a pie promotion that was to begin on May 23, 1997. MDC intended to sell the pie glaze to Denny's in dry-mix form, which would require that Denny's complete the glaze on its own.

One of the major ingredients in a pie glaze is food starch, which is necessary to thicken the glaze. Jaitly contacted Staley and inquired about the use of Staley's starches in MDC's strawberry pie glaze. Eventually, MDC received a sample of Rezista HV starch from Staley, which Staley had recommended for use in making the pie glaze. Along with the sample, Staley attached a disclaimer that recommended MDC to conduct their own tests to determine the fitness of the starch for MDC's particular purpose. Jaitly did indeed test the Rezista HV starch in a variety of different strawberry glaze formulas until she came up with a dry-mix formula that MDC could send to Denny's.

MDC sent the pie glaze created by Jaitly to Denny's for their approval in March 1997. Although Denny's approved the final product, it insisted that MDC send it in "ready-to-use" form, not in a dry-mix form, as MDC had originally planned. Despite no prior experience in preparing ready-to-use products, MDC agreed to send the glaze in ready-to-use form. Because MDC did not have in-house capabilities to produce a ready-to-use glaze, it contracted with FLJ Food Technology and Manufacturing Center ("FLJ") for assistance. FLJ had many years of experience producing ready-to-use pie glaze, and MDC accepted FLJ's advice regarding the techniques and procedures to create a ready-to-use glaze.

On April 10, 1997, MDC entered into a contract with Denny's, in which MDC

agreed to supply pie glaze beginning on May 9, 1997, until the end of Denny's pie promotion, August 22, 1997. As a result of this contract, MDC ordered from one of Staley's distributors 2,500 pounds of Rezista HV on April 11, 1997, and an additional 17,500 pounds on April 14.

On April 15, 1997, MDC conducted a test production run of the pie glaze at FLJ's facility. To make the pie glaze, the dry-mix was placed into a vat with other ingredients, including the Rezista HV starch. The mixture was then cooked at 190°F and then the heat was turned off. The vat, however, did not have a cooling jacket, which would run cool water on the outside of the vat to cool the glaze inside. Instead, MDC and FLJ intended to "hot pack" (packed without cooling the glaze after cooking) the glaze in pouches, then to place the pouches in boxes for shipment. The glaze thus remained in the heated vat for 40–45 minutes while the packaging machine was being prepared.

As the glaze was in the process of being put into pouches, Jaitly stopped the packaging because she noticed that the glaze's consistency was breaking down. The glaze was not thick enough and had, as Jaitly described, a "soup-like" consistency. MDC attributed the breakdown to holding the glaze at a high temperature for too long and to having too low of a pH level.[1]

Jaitly immediately telephoned Staley's Technical Resource Department and spoke with Chuck Lambert on April 15, 1997 to report MDC's problems with the starch. After explaining that the pie glaze was prepared in a vat without a cooling jacket, Lambert told Jaitly that Rezista HV was not the most stable starch to use under the conditions described. Lambert suggested

two other starches and offered to send samples. Jaitly and Elias, however, decided not to switch starches because Denny's had already approved the pie glaze formula using Rezista HV starch and because MDC had already ordered 20,000 pounds of Rezista HV starch.

On April 16, 1997, Jaitly spoke with Joni Simms, a food scientist employed by Staley. Simms recommended cooking the glaze at 190°F and then quickly lowering the temperature below 170°F. Simms also suggested cooking the glaze at a lower temperature, which would compensate for the fact that the glaze would continue to cook in a heated vat after the heat source was turned off. However, Simms told Jaitly that MDC would have to test any of Simms's recommendations.

After speaking with Simms, MDC performed another test run. A different process was used to make the glaze, which included adding water to the pie glaze after the temperature reached 189°F to cool it faster. Jaitly testified that this was a method that Simms had suggested. The glaze was cooked and then packaged. MDC tested several samples taken from this batch and found that they met Denny's specifications. Between April 18 and May 2, 1997, MDC produced 5,400 cases of pie glaze using this new method, and between April 22 and May 15, 1997, MDC shipped 4,200 of those cases to Denny's.

On May 15, 1997, MDC learned that many of Denny's restaurants were having problems with the pie glaze because it was too thin. John Sutherland, a quality control inspector for Denny's, and Jaitly went to the warehouse where the pie glaze was stored. There, they discovered that the

---

1. A pH level is a number on a scale which reflects the acidity or alkalinity of a given solution. The numbers on the scale run from 0 to 14. A low pH level reflects an increasing level of acidity in the solution, whereas a high pH level reflects an increasing level of alkalinity in the solution. The pH level for pure water is 7. Webster's Third New International Dictionary, p. 1692 (Unabridged 3d ed.1981).

pouches were being stored in pallets and that the pouches pulled from the center of the pallets contained much thinner pie glaze than the pouches pulled from the outside sections. Sutherland and Jaitly concluded that the heat in the center pouches did not have a chance to dissipate, which caused the pie glaze in those pouches to break down.

Jaitly once again called Staley and spoke with Mike Bunch, another Staley technical service employee. She told Bunch that MDC had "hot-packed" the glaze, put the pouches into boxes, and then palletized the boxes. Bunch told Jaitly that the breakdown of the center pouches in the pallet was a common problem. He also explained that Rezista HV starts to gelatinize at around 145°F or 150°F, not at 170°F. Therefore, he recommended that MDC use a chiller to cool the product immediately after heating.

MDC informed Denny's about the problem with the pie glaze. At that point, Denny's pie promotion was scheduled to start in less than a week. Denny's told MDC that if it failed to deliver acceptable pie glaze prior to the beginning of the pie promotion, Denny's would not do business with MDC again. However, Denny's agreed to delay the beginning of the promotion until May 25, 1997. MDC immediately began to make more pie glaze, this time using a chiller to cool the pie glaze before packaging it. After completing the pie glaze, MDC shipped the glaze via overnight mail to each of Denny's approximately 2,000 restaurants. This new batch of glaze did not break down.

MDC sued Staley in the United States District Court for the Eastern District of Michigan, claiming breach of warranties, intentional and innocent misrepresentation, and gross negligence. MDC contended that its damages were $114,610.32 for the overnight shipping costs, $54,134.08 in lost product costs, and $6,880.71 in freight to distributors, for a total of $175,625.11. Following Staley's motions for summary judgment, the district court dismissed each of MDC's claims. MDC now appeals the district court's grant of summary judgment. We address each of MDC's three arguments.

## II. ANALYSIS

### A. Express Warranty Claim

MDC argues that the district court erred when it held, as a matter of law, that Simms's April 16, 1997 statement to Jaitly concerning the 170°F temperature did not create an express warranty because Simms's statement was not a part of the basis of the bargain made between Staley and MDC. The issue we face is whether the district court's decision to grant Staley's motion for summary judgment was proper.

We review the grant of summary judgment motions de novo using the identical standards as the initial determination of the motion. *Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union Local 421 v. A–CMI Mich. Casting Ctr.*, 191 F.3d 764, 767 (6th Cir.1999). We are thus required to uphold a district court's grant of summary judgment when no genuine issue as to any material fact remains. Fed.R.Civ.P. 56(c). No genuine issue of material fact exists where the "record, taken as a whole, could not lead a rational trier of fact to find for the [non-moving party]." *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1088 (6th Cir.1996). In considering a motion for summary judgment, "the evidence, all facts, and any inferences that may be drawn from the facts must be reviewed in the light most favorable to the non-moving party." *Landham v. Galoob Toys, Inc.*, 227 F.3d 619, 622 (6th Cir.2000).

**334**

■ Michigan has adopted the Uniform Commercial Code's ("UCC") provisions dealing with express warranties, which state that express warranties can be created by:

(1) An affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the *basis of the bargain* ... or (2) a description of the goods which is made part of the *basis of the bargain* that the goods shall conform to the description.

Mich. Comp. Laws §§ 440.2313(1)(a), (b) (1987) (emphasis added). Thus, two prerequisites must be met before we can find that Simms's statement concerning the 170°F temperature constituted an express warranty. First, her statement must have been an affirmation of fact or promise to MDC or a description of the Rezista HV starch. Second, her statement must have been a part of the basis of the bargain under which MDC purchased 20,000 pounds of Rezista HV from Staley. Simms's statement satisfied the first prerequisite because that statement was a description of Rezista HV's cooling temperature and, as such, comes within the language of § 440.2313(1)(b). However, for reasons to be explained below, we believe that no rational trier of fact could have concluded that Simms's statement was a part of the basis of the bargain made between MDC and Staley. Because the "basis of the bargain" prerequisite was not satisfied in this case, we hold that Simms's statements could not have constituted an express warranty, and thus, the district court's grant of Staley's motion for summary judgment was proper.

Michigan case law has not settled the question of what constitutes a "basis of the bargain" for purposes of express warranties. Therefore, we look to other jurisdictions that interpret the UCC's provision on express warranties to help us understand what "basis of the bargain" means. One such jurisdiction is Oregon, which has enacted the UCC's express warranty provisions as Or.Rev.Stat. § 72.3130. The Oregon Supreme Court interpreted these provisions and held that in order for a statement to constitute a part of the "basis of the bargain," that statement must have been made when "the bargain was still in process." *Autzen v. John C. Taylor Lumber Sales, Inc.*, 280 Or. 783, 572 P.2d 1322, 1325 (Or.1977). In that case, which involved the sale of a boat between two individuals, the court held that the results of a survey describing the boat's condition was a part of the basis of the original bargain, even though the survey was taken four days after the parties had agreed on the purchase price and entered into a contract. In concluding that "the bargain was still in process" at the time of the survey, the court held that "while the parties had agreed upon the purchase price of the boat, none of the other specifics of the contract had been settled." *Id.* Hence, statements made after a contract is formed can still constitute a part of the basis of the bargain as long as there is evidence that shows that the bargaining process is still ongoing. This interpretation is consistent with the UCC's comment that, "[t]he precise time when words of description or affirmation are made ... is not material. The sole question is whether the language ... [is] fairly to be regarded as part of the contract." Mich. Comp. Laws § 440.2313, Cmt. 7.

We hold that at the time of Simms's April 16, 1997 statement to Jaitly, no rational trier of fact could have concluded that Staley and MDC were still in the process of bargaining for the sale of the 20,000 pounds of Rezista HV starch; therefore, Simms's statement cannot be held to be a part of the basis of the bargain. There is no indication, either express or implied, that Staley and MDC left elements of their contract open to future bargaining, as the parties in *Autzen*

did. Hence, the bargaining process had ceased prior to Simms's statement to Jaitly.

For these reasons, we affirm the district court's grant of Staley's motion for summary judgment on MDC's express warranty claim.

### B. Implied Warranty of Fitness for a Particular Purpose Claim

MDC also argues that the district court erred in granting Staley's motion to dismiss MDC's claim for breach of the implied warranty of fitness for a particular purpose. MDC asserts that Staley's recommendation that MDC use Rezista HV starch for its pie glaze constituted an implied warranty of fitness for a particular purpose because Staley knew of MDC's intended use for the pie glaze and the process that MDC used to make the glaze. Therefore, MDC argues that Staley breached the implied warranty of fitness for a particular purpose when the pie glaze thinned out. The district court, however, granted summary judgment in Staley's favor on the ground Staley adequately disclaimed the implied warranty of fitness for a particular purpose. The issue we face is whether the district court's was correct in concluding that the implied warranty was disclaimed.

Because we are reviewing the district court's grant of summary judgment, we apply the same standard of review that we used earlier in reviewing the district court's grant of Staley's motion for summary judgment on the express warranty claim.

The implied warranty of fitness for a particular purpose arises:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is[,] unless

excluded or modified under the next section[,] an implied warranty that the goods shall be fit for such purpose.

Mich. Comp. Laws § 440.2315. However, Michigan law allows this warranty to be disclaimed "by general language ... if it is in writing and conspicuous." Mich. Comp. Laws § 440.2316, Cmt. 4. Furthermore, "[l]anguage to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face thereof.'" Mich. Comp. Laws § 440.2316(2).

[2] We hold that no rational trier of fact could have concluded that Staley did not disclaim any implied warranty of fitness for a particular purpose. We thus conclude that the district court's grant of Staley's summary judgment motion was proper.

When Staley sent the Rezista HV sample to MDC, Staley attached a technical data sheet that contained the following language:

The information contained in this bulletin should not be construed as recommending the use of our product in violation of any patent, or as *warranties (express or implied) of non-infringement or its fitness for any particular purpose.* Prospective purchasers are invited to conduct their own tests and studies to determine the fitness of Staley's products for their particular purposes and specific applications.

(J.A. at 0464–0470) (emphasis added). The data sheet thus contained specific written language that satisfied the requirement that implied warranties of fitness for a particular purpose be disclaimed, at a minimum, by "general language" and "in writing." Mich. Comp. Laws § 440.2316, Cmt. 2. Moreover, the fact that this language was written at the bottom of each page of the data sheet satisfies the requirement

that disclaimers be "conspicuous." *Id.* Lastly, the fact that Jaitly admitted that she received the disclaimer, read it, and understood it to mean that "Staley did not imply conditions in any particular product, and that the customer had to use the starch and test it out in their products" leads us to conclude that no rational trier of fact could believe that Staley did not disclaim all implied warranties of fitness for a particular purpose. (J.A. at 423.)

For these reasons, we affirm the district court's grant of Staley's motion for summary judgment on MDC's claim of implied warranty of fitness for a particular purpose.

### C. Breach of Contract Claim

MDC argues that the district court erred when it denied MDC's motions for rehearing and reconsideration on its breach of contract claim. MDC argued in these motions that a rehearing and/or reconsideration of its breach of contract claim was necessary because the district court had failed to consider this claim in its original opinion. The district court, however, denied these motions on the ground that MDC waived the breach of contract claim by failing to raise this claim in its complaint and by failing to amend its complaint to include the breach of contract claim. Although Count I of MDC's complaint was entitled "Breach of Contract/Product Warranties," the district court held that Count I only addressed breach of warranty claims and did not specifically delineate a claim for breach of contract. (J.A. at 0030).

The issue we face is whether the district court erred in denying MDC's motions for rehearing and reconsideration on its breach of contract claim. MDC brought its motion pursuant to the Eastern District of Michigan's Local Rule 7.1(g). We have held that general motions for rehearing and reconsideration brought pursuant to

Local Rule 7.1(g) are treated as Federal Rules of Civil Procedure 59 motions. *Crown Service Plaza Partners v. City of Rochester Hills,* 2000 WL 658029, \*\*3 (6th Cir.2000) (citing *Columbia Gas Transmission Corp. v. Limited Corp.,* 951 F.2d 110, 112 (6th Cir.1991)). We have also held that denials of motions to alter judgment under Rule 59 are typically reviewed for abuse of discretion. *Perez v. Aetna Life Ins. Co.,* 150 F.3d 550, 554 (6th Cir.1998). However, when the Rule 59 motion seeks review of a grant of summary judgment, we apply a de novo standard of review. *Id.* In the instant case, MDC has brought a general motion for rehearing and reconsideration pursuant to Local Rule 7.1(g). Therefore, we treat MDC's motion as a Rule 59 motion. *Crown Service Plaza Partners,* 2000 WL 658029 at \*\*3. Moreover, because MDC seeks review of the district court's grant of summary judgment in favor of Staley, we must review MDC's motion de novo. *Perez,* 150 F.3d at 554.

After thorough review of MDC's complaint, we find that MDC's only mention of its breach of contract claim was the title of Count I, which reads "Breach of Contract/Product Warranties." (J.A. at 0007–0018). Beyond this title, MDC did not devote any portion of its complaint to discussing its breach of contract claim. MDC's failure to elaborate on this claim leads us to agree with the district court's conclusion that MDC failed to plead properly its breach of contract claim. Moreover, we find no indication that MDC amended its complaint to explain its breach of contract claim. Because MDC failed to plead its breach of contract claim in its original complaint and failed to amend its complaint, the district court had no reason to consider this claim in its original opinion and order. Consequently, we hold that the district court did not err

in denying MDC's motions for rehearing and reconsideration on its breach of contract claim.

For these reasons, we affirm the district court's denial of MDC's motions for rehearing and reconsideration on its breach of contract claim.

### III. CONCLUSION

For the reasons set forth above, we AFFIRM the judgment of the Honorable Lawrence Zatkoff of the United States District Court for the Eastern District of Michigan.