**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0177n.06
Filed: March 8, 2006

No. 05-3498

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| LINDA SMITH; | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | |
| | ) | |
| GREGORY SMITH, | ) | |
| | ) | ON APPEAL FROM THE |
| **Plaintiff,** | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| GENERAL MOTORS CORPORATION GENERAL | ) | **M E M O R A N D U M** |
| MOTORS GLOBAL HEADQUARTERS and | ) | **O P I N I O N** |
| POWERTRAIN DIVISION MORAINE ENGINE | ) | |
| PLANT; | ) | |
| | ) | |
| **Defendants-Appellees.** | ) | |
| | ) | |
| | ) | |
| CHERYL McCURDY as PLANT MANAGER | ) | |
| GENERAL MOTORS CORPORATION | | |
| POWERTRAIN DIVISION MORAINE ENGINE | | |
| PLANT, | | |
| | | |
| **Defendant.** | | |

**BEFORE:**   **MOORE and McKEAGUE, Circuit Judges;  POLSTER, District Judge.**[*]

---

[*] The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

**McKEAGUE, Circuit Judge.** Plaintiff-appellant Linda Smith appeals the district court's grant of summary judgment in favor of defendant-appellee, General Motors Corporation. Smith filed this action against General Motors to recover for injuries sustained during her employment at the Moraine Engine Plant in Moraine, Ohio. Smith asserts that she is entitled to recovery under the intentional tort exception to the Ohio Workers' Compensation Act. The district court granted defendant's motion for summary judgment, finding that Smith had not presented sufficient evidence to raise a genuine issue of material fact concerning whether General Motors knew with "substantial certainty" that the injury she sustained was likely to occur. For the following reasons, we affirm the district court's decision.

## I. BACKGROUND

### A. Facts

This case arises from injuries Linda Smith ("Smith") incurred on February 9, 2000, while working for General Motors Corporation Powertrain Division ("GM") at the Moraine Engine Plant located in Moraine, Ohio. The facts are not in dispute. Smith began her employment with GM in 1993, initially working on an assembly line. After six years, Smith began working as a job-setter. She performed this job for one and one-half years prior to her injury. For the two months preceding her accident, Smith worked on Operation 40, an automated assembly line composed of 14 stations of machines. Some of these machines were multi-spindle drilling machines, designed to drill holes in the top of engine heads.

As a job-setter, Smith was expected to perform maintenance on Operation 40. On the day of her injury, Smith was wearing Tyvek coveralls and had her hair pulled back in a ponytail, as was

her habit. GM provided the coveralls for workers, to help keep their personal clothing clean. GM did not require the employees to wear them. The coveralls have long, loose fitting sleeves and come in three sizes; small, medium, and large.

On February 9, 2000, a bushing broke on one of the spindle drills in Operation 40. Because this was not an unusual occurrence, job-setters had a normal procedure to follow in order to repair the bushing. Initially, the job-setter would attempt to repair the broken bushing herself. If that was unsuccessful, the job-setter would call a Skilled Trades employee for assistance. Smith was able to locate the broken bushing, but realized that she would be unable to repair it herself. She summoned Jason Caldwell, a Skilled Trades employee for assistance.

There are two methods used to shut off Operation 40. The first is to use the lockout/tagout procedure, which completely shuts down the Operation. The second is to turn the shutoff switch, which would not shut off all the power to the machine, allowing the spindle drills to continue spinning. Operation 40 was surrounded by a six-foot high metal barrier with an entry gate. An employee could walk through this entry without having the machines turned off.

Prior to performing the lockout/tagout procedure, both Smith and Caldwell went inside the gate so that Smith could show him the broken bushing. However, before repairing the bushing, they shut off Operation 40 by using the lockout/tagout procedure. After the bushing was repaired, Smith restarted Operation 40. Although the spindle drills began to turn normally, the engine heads did not move down the line to be drilled, indicating that something was still not right with the Operation. With Caldwell looking on, Smith went inside the gate for a closer look at station 14, because the view of this area was obliterated by the barrier. The spindles continued to spin, because it was

necessary for the machine to be on in order to determine the location of the jam. Once inside the gate, Smith used her flashlight to illuminate the machine in an effort to locate the problem. Not seeing the problem, she turned to walk away. However, a spindle drill which continued to turn became entangled with the sleeve of her Tyvek coveralls. Thereafter, her ponytail also became entangled in a turning spindle drill. As a result, Smith suffered severe injuries, including having her scalp removed from her head.

### B. Procedural Background

This action was originally filed in Montgomery Court of Common Pleas in December of 2001. The case was removed by the defendant to Federal Court, pursuant to 28 U.S.C. § 1332, in January of 2002. The defendant filed a motion for summary judgment on May 28, 2003. Subsequently, the plaintiff was given oral notice that the court was planning on granting defendant's motion for summary judgment. Based on this information, the plaintiff filed a motion for reconsideration on September 25, 2003. However, the district court did not grant defendant's motion for summary judgment until March 22, 2004. The plaintiff then filed a renewed motion for reconsideration on April 26, 2004. The district court issued a decision overruling plaintiff's renewed motion for reconsideration on March 24, 2005. This appeal followed.

## II. JURISDICTION

The district court exercised subject matter jurisdiction under 28 U.S.C. § 1332, because the proper parties are citizens of different states and the amount in controversy exceeds $75,000.[1] This

---

[1]The district court found that plaintiffs fraudulently joined Cheryl McCurdy as Plant Manager in order to spoil diversity. McCurdy was not a party to the original complaint. Plaintiffs

court has jurisdiction pursuant to 28 U.S.C. § 1291, because this is an appeal of the district court's

March 24, 2005, order denying plaintiff's motion for reconsideration, which order left unchanged

the final order granting defendant's motion for summary judgment entered on March 22, 2004.

This court reviews de-novo a district court's grant of summary judgment. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Johnson,* 398 F.3d at 873. When deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close,* 379 F.3d 413, 416 (6th Cir. 2004). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original).

## III. ANALYSIS

### A. Issues on Appeal

---

have not appealed this finding, and McCurdy is not a party to this appeal. *See Smith v. GM,* 02-CV-00029-WHR at 2, n.2.

The parties advance three issues on appeal. First, Smith avers that the district court erred in finding that there were no issues of material fact as to whether GM knew with "substantial certainty" that Smith's injuries were likely to occur, as is required for a finding of employer intentional tort. Second, Smith also claims that the court erred in not construing the evidence presented in the light most favorable to her, the non-movant, as required by Fed. R. Civ. P. 56. Third, GM advances an alternate theory of affirmance; stating that GM never required plaintiff to perform any task with the knowledge that injury was substantially certain to occur.

**B. Ohio Law Governing Employer Intentional Tort**

A federal court exercising jurisdiction pursuant to 28 U.S.C. § 1332 must apply the substantive law of the forum state. *See U.S. v. Jandro,* 167 F.3d 309, 313 (6th Cir. 1999). In Ohio, employees injured in the course of their employment are usually limited to the remedial measures afforded by the Ohio Workers's Compensation Act. *See* O. Const. II § 35, *see also* OHIO REV. CODE ANN. § 4123 *et seq.* There are certain instances when an employee may seek redress for an injury outside of the Act. An injury caused by the intentional tort of the employer is such an event. *See Blankenship v. Cincinnati Milacron Chemicals, Inc.,* 433 N.E.2d 572, 576 (Ohio 1982) (explaining that an employee is not precluded from pursuing common law remedies for an intentional tort committed by his employer). In *Fyffe v. Jeno's,* 570 N.E.2d 1108, 1112 (Ohio 1991), the Supreme Court of Ohio set out the test used to determine whether an employer has committed an intentional tort. In such a case, the plaintiff must prove:

> 1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation;

2) knowledge by the employer that if the employee is subjected by his employment to such a dangerous process, procedure, instrumentality, or condition, then harm to the employee will be a substantial certainty; and
3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.

*Id.* at 1112.[2] According to *Fyffe*, a plaintiff must offer proof beyond that required for negligence, or recklessness. *Id.* In the absence of direct evidence of intent, a plaintiff may prove such a claim by inferred intent. *Id.*

Ohio law creates a harsh test for establishing employer liability for an intentional tort. *See Goodwin v. Karlshamns U.S.A., Inc.,* 619 N.E.2d 508, 512 (Ohio App. 1993) (stating "a reckless tort is not sufficient to allow recovery against one's employer"). In *Jandro v. Ohio Edison Co.*, the Sixth Circuit stated "it must be shown that the employer '(1) specifically desired to injure the employee; or (2) knew that injury to an employee was certain or substantially certain to result from the employers act, and despite this knowledge, still proceeded.'" 167 F.3d 309, 313 (6th Cir. 1999) (quoting *Mitchell v. Lawson Milk Co.*, 532 N.E.2d 753, 756 (Ohio 1988)). It is not enough that harm was likely to occur, or that there was a high risk that it would occur. *Jandro*, 167 F.3d at 313. Acts of an employer that have a high risk of harm are most often reckless acts, but could under certain

---

[2]The Ohio legislature passed R.C. 2745.01, effective October 20, 1993. This legislation was intended to revise the requisite elements and standards of an employer intentional tort. However, the statute was found to be unconstitutional, because it imposed excessive standards and a heightened burden of proof for plaintiffs seeking a remedy for an employer intentional tort. *See Johnson v. B.P. Chemicals, Inc.*, 707 N.E.2d 1107 (Ohio 1999) ("Because R.C. 2745.01 imposes excessive standards (deliberate and intentional act), with a heightened burden of proof (clear and convincing evidence), it is clearly not a "law that furthers the' . . . comfort, heath, safety, and general welfare of all employees.'" *Id.* at 1114 (citation omitted). Since that time, the Ohio legislature repealed R.C. 2745.01 and passed H.B. 498, revising R.C. 2745.01 effective April 4, 2005. The revised statute is less stringent than the former. Because the injury in this case occurred in the year 2000, there are no controlling statutes, and *Fyffe* and its progeny control our determination.

circumstances "equate to one that is substantially certain to result in harm to the employee, and reasonably raise a justiciable issue of an intentional tort." *Fyffe,* 570 N.E.2d at 1111-12. The plaintiff must show, by a preponderance of the evidence, that the employer had "actual knowledge of the exact dangers which ultimately caused" injury. *Sanek v. Duracote Corp.,* 539 N.E.2d 1114, 1116-17 (Ohio 1989) (citation omitted).

### C. Smith's Issues on Appeal

Smith asserts that the district court erred in finding that there were no issues of material fact that GM did not know with "substantial certainty" that Smith's injuries were likely to occur, and the court erred in not construing the evidence presented in the light most favorable to her, the non-movant, as required by Fed. R. Civ. P. 56. Because our analysis of the defendant's motion for summary judgment requires de novo review, we must necessarily construe the record in the light most favorable to Smith. *See Matsushita Elec. Indus.Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Therefore, the analyses of these two issues are conflated.

Smith maintains that GM was substantially certain that her injury would occur because of her working conditions. She asserts that the barrier surrounding the spindle drills of Operation 40 was a "guard", and that GM required her to "circumvent" this guard in the performance of her duties as a job-setter. She states that because GM provided loose, Tyvek coveralls to their employees, and allowed employees working near rotating machinery to wear their hair in ponytails in contravention to GM's own safety policies, GM was substantially certain that the injury she suffered was likely to occur. In addition, the lack of ambient lighting in the area of the spindle drills required Smith to

use a flashlight to investigate a problem with the transfer bar, and this forced her to be in close proximity to the operating and dangerous machinery.

Smith further asserts that GM was substantially certain that her injury would occur because a previous injury had occurred in 1993 to Randy Petit, another GM employee working at the Moraine Engine Plant. We consider these factors in turn, bearing in mind the stringent standard required for a finding of substantial certainty of injury in employer intentional tort cases.

*1)      The barriers surrounding Operation 40's rotating spindles should be considered a "guard", and GM required circumvention of the "guard" in the performance of Smith's job duties.*

Smith states that the mesh barriers surrounding Operation 40 should be construed as a guard, in keeping with the definition of a "guard" by the Industrial Commission of Ohio. The commission defines a guard as "the covering, fencing, railing or enclosure, which shields an object from accidental contact (see 'safety guard')." Ohio Admin. Code 4123:1-5-01 (B) (69). Smith asserts that GM management agreed that the mesh fencing with gate was considered a guard, with the gate portion being identified as a "swing guard". She states that because the mesh fencing with a swing guard was a "guard", GM's requirement that she "circumvent" the guard in order to perform her tasks as a job-setter created an issue of material fact as to whether GM committed an employer intentional tort.

The district court correctly found that the evidence proffered by Smith concerning the "guard" failed to raise a genuine issue of material fact on the second prong of the *Fyffe* test. The court stated"[t]he essential fact supporting the conclusion that there was a genuine issue of material

fact on the substantial certainty prong in *Fyffe* was that the employer had removed a safety guard which permitted the plaintiff to be injured. Herein, there is no suggestion that the Defendants removed a safety guard from operation 40 or did anything remotely similar to the actions of the employer in Fyffe." *Smith v. GM, et al ,* No.02 -CV-00029-WHR at 13, n.10 (hereinafter "slip op.").

Smith relies on *Fyffe* to assert that the "removal" of a safety guard by an employer creates an issue of material fact, because a jury could conclude that an injury was substantially certain to occur once the guard was removed, and the intent required for an employer intentional tort could be inferred from such an action. In *Fyffe*, a Plexiglas safety guard designed to prevent individuals from getting their hands caught in a moving conveyer belt was routinely removed prior to cleaning the conveyer. *Fyffe*, 570 N.E.2d at 1113. Although the machinery was not supposed to run while the guard was removed for cleaning, Fyffe was taught by his supervisor to clean with the conveyer moving, because it expedited the cleaning process. *Id.* at 1114. It was during this cleaning process that Fyffe's arm was pulled into the conveyer and he suffered severe injuries. *Id.* at 1110. The court found that the removal of the Plexiglas safety guard and the employer's instruction that the conveyer should be run during the cleaning process raised an issue of material fact as to whether the employer committed an intentional tort. *Id.* at 1113-14.[3]

---

[3]Smith also relies on the unpublished case, *Jones v. Bryan Canning Co.*, No. WM-97-4466, 1998 Ohio App LEXIS 708 (Ohio Ct. App. Feb. 27, 1998) for the proposition that the removal of a safety guard raises an issue of material fact as to whether an employer has committed an intentional tort. In *Jones*, the plaintiff was taught to clean an auger with towels while the auger was moving. *Jones* at *2. "In order to be able to insert the rolled up towels, appellant was told to remove the cover on a 'nip point',- an area usually enclosed because of its potential for injury to

Smith compares the entry into the mesh fencing surrounding Operation 40 through the swing guards to the circumvention of the guards in both *Fyffe* and *Jones*. "Appellee subjected Linda Smith and her co-workers to the dangers of the revolving spindles by requiring them to circumvent the safety guard and troubleshoot within close proximity of same." (Appellant Br. 27) Yet, the deposition testimony of Peter Buczek, a GM safety supervisor describes the metal fencing as an "awareness barrier." When asked to define an awareness barrier, Buczek stated: "[a] practical definition is it was a guard that would prevent somebody from going into the hazard area inadvertently. And to access the area to do troubleshooting they would have to open the device, making them aware that they were entering an area that could be hazardous if it was operating." (Buczek Dep. JA 557) Smith herself stated that entry into the fenced area was sometimes necessary in order to view the transfer bar and see where it was jammed. (Smith Dep. JA 683) "The reason it was necessary for power to the equipment to remain on while troubleshooting a jam up was because if the power was not on to the transfer bars the fingers that held the engine head would drift down and no longer be in contact, rendering it impossible to see where the jam up existed." (Appellant Br. 7)

Unlike the cleaning procedures in both *Fyffe* and *Jones*, entry through the barrier was the only way a problem involving the transfer bar could be diagnosed. (Appellee Br. 4-10) The

persons working around the auger. A warning label, which originally illustrated that the auger should not be engaged while the nip point cover was off had been partially obliterated due to wear and tear and cleaning of the machine . . . ." *Id.* Further, the management acknowledged that it had never advised the staff about the dangers of the towel cleaning method, or circumventing the "nip points". *Id.* at 3.

procedure involved visualizing the machinery from a distance of about two feet. At no time did anyone instruct Smith to insert any part of her body into the rotating spindles or moving machinery, in contrast to *Fyffe* or *Jones*. Smith readily admitted that she understood the dangers of being in proximity to moving pieces of machinery, that it was "common sense." (Smith Dep. JA 683) Further, Smith attended regular safety training at GM. (Smith Dep. JA 671-80)

Even assuming the mesh fencing with the "swing guard" was a guard within the terms of the Ohio Administrative Code, there is no evidence in the record that the guard was removed by GM management, nor did GM management instruct the employees to circumvent the guard. In fact, GM management routinely entered the area through the "swing guard" to visualize the machinery. (Smith Dep. JA 683) The district court properly noted that "the defendant's affirmative act must be more than merely passively condoning practices and procedures, which, in hindsight, subject employees to a greater risk of harm. That may be negligence or even recklessness, but it does not constitute the inferred intent which is required by *Fyffe*." *Smith,* slip op. at 14.

*2)	GM provided loose fitting long sleeved Tyvek coveralls and allowed women to work around rotating machinery with their hair in ponytails in direct contravention to GM's own safety requirements. In addition, the lack of adequate ambient lighting in the work area required Smith to use a flashlight and get in closer proximity to the dangerous equipment.*

Smith acknowledged that the Tyvek coveralls provided by GM for the employees were intended to protect the workers personal garments, and GM did not require that employees wear the garments. (Smith Dep. JA 676) The employees themselves could choose the appropriate size from small, medium, or large. *Id*. at 678. Smith personally selected a size large coverall to wear. *Id*.

She argues, however, that the size of the garment she chose was immaterial, because the danger arose because of the loose fitting long sleeves. (Appellant Final Br. 19) She points out that wearing loose garments and long sleeves is in direct contravention to the GM safety rules, which state: "the wearing of loose clothing, long sleeves, neckties, bracelets, necklaces, wristwatches, or similar jewelry is not permitted while working around revolving machinery." (GM Powertrain Assembly Plant general safety rules and practices; JA 513-514) The rules also state "[w]here there is a danger of long hair being caught in the moving machinery or equipment, caps or hair nets must be worn or hair must be tied back." (JA 517) Smith asserts that because GM knew she was required to work near rotating machinery in a poorly lit area, wearing loose fitting coveralls with her hair in a ponytail, they knew with substantial certainty that the injury she had was likely to occur.

The district court correctly found that these working conditions did not raise an issue of material fact as to whether GM knew to a substantial certainty that Smith's injury would occur. Under Ohio law, GM's failure to prohibit its employees from wearing loose fitting coveralls and ponytails while working in decreased ambient lighting is not egregious enough to find that GM had the inferred intent required for an intentional tort. In *Jandro v. Ohio Edison*, the court stated that evidence beyond that which is required for both negligence and recklessness is required to establish an intentional tort by an employer. 167 F.3d 309, 313 (6th Cir. 1999) (citing *Mitchell v. Lawson Milk Co.*, 532 N.E.2d 753, 756 (Ohio 1988)). In *Mitchell,* the Ohio Supreme Court found that "mere knowledge of a risk falls short of substantial certainty and does not by itself establish intent." *Id.* at 753. The court stated:

> When the employer acts despite the knowledge of some risk, the employer's conduct may be negligent. When the risk is great and the probability increases that certain consequences may follow, the employer's conduct may be reckless. As the probability that certain consequences will follow further increases and the employer knows that injury to employees is certain, or substantially certain, to result from his act, and he still proceeds, he is treated by the law as if he had in fact desired to produce the result.

*Id.* at 755, quoting *Van Fossen v. Babcock & Wilcox Co.,* 522 N.E.2d 489 (Ohio 1988) (paragraph six of the syllabus), and *Kunkler v. Goodyear Tire & Rubber Co.,* 522 N.E.2d 477, 481 (Ohio 1988)

In *Jandro,*, an electrical lineman was electrocuted while engaging in a dangerous procedure known as "sliding the ground". 167 F.3d at 312. This procedure was sometimes used by experienced lineman, but was never supposed to be done without a special "hot-line" tool, according to the employer's safety guidelines. *Id.* While the court found that management was at least constructively aware of several safety violations, including the failure to hold a required safety meeting prior to beginning the job, the use of a lift machine with controls that were not working, and inadequately trained crew members, the court found that the management could not be substantially certain that Jandro's death would have occurred. In so deciding, the court stated :

> The district court was correct when it wrote that "the intentional tort exception to the Workers' Compensation Act . . . [encompasses] a particular scenario under *Fyffe*: one in which the employer is virtually certain that harm is about to occur but chooses to 'look the other way' in the interest of continuing the job. One might describe this scenario as one in which the employer takes a stance of 'active ignorance' or even 'willful blindness' in the face of an assured danger.

*Id.* at 316 (6th Cir. 1999). Based on *Jandro*, the mere knowledge of a safety violation or a dangerous condition is not enough to support a finding of an employer intentional tort. "Even if

[defendant] knew of and appreciated the risks . . . the violations involved were not substantially certain to cause an accident." *Jandro*, 167 F.3d at 315.

Further in *Sanek v. Duracote Corp*., the Ohio Supreme Court stated;

> There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved. Such conduct may be characterized as gross negligence or wantonness on the part of the employer. However, in view of the overall purposes of our Workers' Compensation Act, such conduct should not be classified as an 'intentional tort', and therefore an exception, under *Blankenship* or *Jones* to the exclusivity of the Act.

539 N.E.2d 1114, 1117 (Ohio 1989) (quoting *Van Fossen v. Babcock & Wilcox Co.*, 522 N.E.2d 489, 504-05 (Ohio, 1988)). Thus, even if GM knew that wearing coveralls and ponytails was contrary to their safety policies, and the ambient lighting required the use of a flashlight to visualize machinery, we agree with the district court that GM was not substantially certain that the injury Smith suffered was going to occur.[4]

### 3) *The trial court failed to acknowledge the presence of a prior similar incident, and failed to construe the facts of the prior incident in the light most favorable to Smith.*

According to Smith," a prior incident did in fact occur when another employee also became entangled. The prior incident involved loose clothing being caught in the revolving spindles of the spindle machine when the employee circumvented a guard to perform repair work." (Appellant Br.

---

[4] An employer's failure to follow documented safety procedures does not necessarily infer a finding of a substantial certainty of injury. *See Edsall v. Hose Master, Inc.,* 1997 Ohio App. LEXIS 5697 (Ohio Ct. App. 1997) (Despite the employer instructing the employee to make adjustments to a machine while it was still running, in contravention of required safety procedures, the court found no substantial certainty of injury when the employee's hand slipped into the operating machine and she was injured.).

20) Randy Pettit, an employee at the Moraine plant was injured in 1993, seven years prior to the injury sustained by Smith. Pettit was working on a multi-spindle drilling machine on Operation 20, an operation that bored holes in bearing caps. (Pettit Dep. JA 644) Pettit testified, "I reached in to move a coolant line and the drills caught around my stomach, around my coveralls, around my stomach and it just wound up." *Id*. Pettit suffered injuries requiring him to be off of work for approximately 10 weeks. *Id*. Smith relies on this accident to show that GM had knowledge of a prior incident, and therefore, GM knew to a substantial certainty that her injury would occur.

The district court found that Pettit's injury was caused by his reaching into the machine to move a coolant line, which caused his coveralls to be caught in the drills. *See Smith,* slip op. at 16. We agree. Pettit was not trying to visualize a transfer bar in darkened surroundings when the loose sleeve of his coverall was caught in the machine, as was the case with Smith. When asked if his coveralls were loose or hanging, as Smith avers, he replied, "No. Not really. I mean I just got too close to the drill." (Pettit Dep. JA 644)

To establish that an employer knew with substantial certainty that an injury would occur, "[t]he plaintiff has the burden of proving by a preponderance of the evidence that the employer had "actual knowledge of the *exact dangers* which ultimately caused injury." *Sanek,* 539 N.E.2d at 1117. Even viewing Pettit's injury in the light most favorable to Smith, it simply does not support a finding that Pettit's injury gave GM prior notice of the *exact dangers* that Smith claims caused her injuries. In fact, loose coveralls, the lack of adequate ambient lighting, and wearing a ponytail had *nothing* to do with Mr. Pettit's injuries, according to his own deposition testimony. Therefore, the

district court was correct in finding that Pettit's injury was not a prior incident that would cause GM to have substantial certainty that Smith's injury would occur.

### D.  GM's Issue on Appeal

Having found that the district court correctly decided that there are no issues of material fact as to whether GM knew with substantial certainty that Smith would be injured under the second prong of *Fyffe*, it is unnecessary to evaluate GM's claim of an alternate ground for affirmance.

## IV. CONCLUSION

For the aforementioned reasons, the opinion of the district court granting summary judgment to the defendant, GM, is AFFIRMED.