STUMP, Appellee,

v.

INDUSTRIAL STEEPLEJACK COMPANY, Appellant, et al.

[Cite as *Stump v. Indus. Steeplejack Co.* (1995), 104 Ohio App.3d 86.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 66937.

Decided May 22, 1995.

*McIntyre, Kahn & Kruse Co., L.P.A., Mark F. Kruse* and *Patrick J. Gallagher,* for appellee.

*Green & Tulley* and *Joseph P. Tulley,* for appellant.

JAMES M. PORTER, Judge.

Defendant-appellant, Industrial Steeplejack Company, appeals from the judgment of the Cuyahoga County Common Pleas Court insofar as it found liability following a bench trial for the injuries suffered by plaintiff-appellee, Frank Stump, arising out of his fall from his employer's scaffold when the support rope separated. In this intentional tort case, defendant contends that the trial court's findings of fact and conclusions of law were against the manifest weight of the evidence and contrary to law and that the court erred in the admission of

prejudicial and irrelevant evidence. We find no error and affirm the judgment below.

On April 29, 1988, plaintiff was an employee of defendant, which was engaged in the business of repairing and maintaining the exterior of buildings, towers and structures. Plaintiff was an experienced employee, being in his tenth year in the trade. Defendant's business required that its employees perform their work some distance above the ground, using scaffolding or staging. When motorized raising and lowering equipment attached to the building is not available, the scaffold is raised and lowered by hand, by means of rigging consisting of ropes, pulleys, or similar devices operated by the Steeplejack employees. The ropes are securely fastened to the top of the structure, and the scaffold is lowered from floor to floor to permit the work to be done at the required location.

The policy of the defendant, the custom of the trade, and OSHA regulations require that employees working above ground use certain safety equipment designed specifically to protect them from injury, including hard hats, safety belts, lifelines, and rope-grabs.

The safety protection customarily used in scaffolding work includes a lifeline arrangement, i.e., a polypropylene line that is fastened securely to the top of the building where the work is being done and extending to the ground. The employee is usually equipped with a device called a rope-grab. This device is attached securely to a broad belt around the midsection of the employee by means of a lanyard three to four feet in length. At the other end of the lanyard is the rope-grab itself, which is a device that is attached firmly, without slipping, to the lifeline suspended from the top of the building. The rope-grab has a release operated by the worker, which permits him to move the rope-grab to differing locations on the lifeline, as the worker and the scaffolding ascends or descends the face of the building. The polypropylene lifeline has a limited amount of inherent stretch, so that if a worker falls from the scaffold the rope grab, attached to the lifeline, will keep him from falling all the way to the ground. The lifeline will stretch, thereby cushioning his stop and avoiding other injury.

On the day in question, the plaintiff was one of a three-man work crew consisting of plaintiff, Rob Kriso, and John Gregory Frost (son of the owners of the employer company). Plaintiff had considerably more experience in the trade than John Gregory Frost (known as "Greg"), who was only in his second year in the business as a full-time employee. Greg Frost, the day before, had obtained the necessary equipment at company headquarters, including the scaffolding, pulleys and a six-hundred-foot length of three-quarter-inch manila line, which was to be used for the rope falls making up the rigging to raise and lower the scaffold. He visually inspected the rope as he pulled it out of a fifty-five-gallon drum used by the defendant to store ropes. Frost pulled the rope out of the barrel to verify

its length and inspected it as he fed it back into the barrel for transportation. He did not further inspect the rope by twisting it open to check its interior.

At the work site of the Bosco Building in Cleveland, the truck was unloaded, and Greg Frost proceeded to the top of the building to perform the necessary preliminary work of attaching the lifeline and the rigging for the scaffold. Kriso and plaintiff remained on the ground and made up the scaffolding and rigging which was to be used. Plaintiff testified that when unloading the truck, he saw that the scaffolding rope was discolored and rotted in several places and called it to Greg Frost's attention. According to plaintiff, Greg inspected the rope himself and agreed that it showed deterioration; then Greg said to plaintiff, "What do you want me to do, take the time to go get another rope * * *?" Greg ruled out obtaining a new rope as too time-consuming and they went on with the rigging. Before he went aloft, plaintiff testified that he looked for rope grabs in the gang box of supplies and could not find any.

The plaintiff and Greg Frost went to the top of the building to where the scaffold had been raised. They mounted the scaffold, which was supported solely by the rope in question, and lowered the scaffold several feet into position, where they began to tuck-point the masonry exterior of the building.

After finishing the uppermost area, the plaintiff and Greg unloosened the scaffold lines and lowered it to the next location. They played out a length of line and prepared to tie the lines at the new height. At this time, the plaintiff and Greg were at opposite ends of the scaffold, each working at a pulley arrangement. They were about thirty to thirty-five feet above ground.

The evidence was in dispute as to whether either man was wearing a safety belt. If they were, they were not attached to the lifeline while they were moving the scaffold. Suddenly, the three-quarter-inch line holding up plaintiff's end of the scaffold failed, that end of the scaffold dropped abruptly, and both men fell some thirty to thirty-five feet to the ground. Plaintiff was seriously injured and Greg Frost fell on top of him and had minor injuries.

It was later determined that one portion of the three-quarter-inch manila line that failed had sustained dry rot, which caused the failure. The rope, however, was not preserved by defendant and was discarded in the local landfill. Several weeks following the fall, Greg visited plaintiff in the hospital and admitted in the presence of plaintiff's roommate that he knew the rope was bad prior to setting up the scaffold.

Plaintiff filed suit on April 12, 1989 and alleged an intentional tort by his employer under R.C. 4121.80 of the Workers' Compensation Act, Am.Sub.S.B. No. 307, 141 Ohio Laws, Part I, 718, 733.

The case was tried to the court without the intervention of a jury, upon the issue of liability only. At the conclusion of plaintiff's presentation of evidence and at the end of all the evidence, defendant's motions for dismissal were overruled.

Upon the submission of written briefs and proposed findings of fact and conclusions of law, the trial court adopted the plaintiff's findings of fact and conclusions of law and rendered judgment in favor of the plaintiff that the employer had committed an intentional tort as provided for in former R.C. 4121.80. Defendant appealed.

Defendant's appeal was dismissed as premature, based upon this court's determination that R.C. 4121.80 had been found unconstitutional by the Ohio Supreme Court in *Brady v. Safety–Kleen Corp.* (1991), 61 Ohio St.3d 624, 576 N.E.2d 722, and that the judgment entry of the trial court on the issue of liability only without determining damages was not a final order. *Fireman's Fund Ins. Cos. v. BPS Co.* (1982), 4 Ohio App.3d 3, 4, 4 OBR 23, 23, 446 N.E.2d 181, 181–182. This court remanded the case to the trial court for determination of damages. See *Stump v. Indus. Steeplejack Co.* (Mar. 4, 1993), Cuyahoga App. Nos. 61959 and 61972, unreported, 1993 WL 58602.

Upon the hearing on damages, the trial court awarded $1,026,967.60 and entered judgment for that amount. The award includes prejudgment interest, which was not contested or appealed by defendant.

The cause having been fully heard, defendant filed a timely notice of appeal from the final judgment in favor of plaintiff.

We will address defendant's assignments of error together where it facilitates discussion of the legal issues:

"I. The trial court erred to the prejudice of the defendant-appellant in adopting findings of fact and conclusions of law prepared by plaintiff-appellee, and in rendering judgment in favor of plaintiff-appellee, in that such findings of fact, conclusions of law, and final judgment are not supported by a preponderance of the evidence and the final judgment is contrary to the manifest weight of the evidence.

"II. The trial court erred to the prejudice of the defendant-appellant in rendering final judgment in favor of the plaintiff-appellee in that said judgment is contrary to law.

"* * *

"IV. The trial court erred to the prejudice of the defendant-appellant in finding that John Gregory Frost was part of management of defendant-appellant and thus, the alter ego of Industrial Steeplejack Company, the defendant-appellant.

"V. The trial court erred to the prejudice of the defendant-appellant in its finding of fact and conclusion of law that the acts and omissions to act on the part of John Gregory Frost were attributable to the defendant-appellant."

We find that this appeal turns on application of the intentional tort doctrine that holds the employer liable when it in fact knows that the existence of a condition is substantially certain to cause injury or death to the employee.

The Supreme Court in *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, paragraphs one and two of the syllabus, set forth the law applicable to an intentional tort action brought against an employer:

"1. Within the purview of Section 8(A) of the Restatement of the Law 2d, Torts, and Section 8 of Prosser & Keeton on Torts (5 Ed.1984), in order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. (*Van Fossen v. Babcock & Wilcox Co.* [1988], 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph five of the syllabus, modified as set forth above and explained.)

"2. To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent. (*Van Fossen v. Babcock & Wilcox Co.* [1988], 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph five of the syllabus, modified as set forth above and explained.)"

Addressing Assignments of Error IV and V first, we have no difficulty in holding that there was sufficient evidence on which to find that the knowledge and conduct of Greg Frost were imputed to defendant company. It was an issue of fact whether the son was the supervisor for, and agent of, defendant on the job

site. Greg had worked for his parents' company from the time he was fifteen; he was paid a salary twice the amount of the hourly employees despite lesser experience; he was given a vehicle for company use; he was in charge on the job site and the person to whom the other employees reported; he instructed the others when and where to report to work; he carried the plans and specifications for the work; he dealt with the site owners for access and security purposes; he had input in management decisions; and he evaluated the other employees. There was ample evidence to support the conclusion that Greg was the defendant's managerial representative and agent on the job site at the time of the accident. His knowledge and conduct are fairly imputed to defendant under the theory of apparent agency. *Shaffer v. Maier* (1994), 68 Ohio St.3d 416, 418, 627 N.E.2d 986, 988; *Damon's Missouri, Inc. v. Davis* (1992), 63 Ohio St.3d 605, 608, 609, 590 N.E.2d 254, 258; *Master Consol. Corp. v. BancOhio Natl. Bank* (1991), 61 Ohio St.3d 570, 576, 575 N.E.2d 817, 822.

■ There can be no question on the facts of this case that the deteriorated rope was a dangerous condition when used as the sole support of the scaffold and that the employer had knowledge of the danger once it was called to son Greg's attention. Despite plaintiff's objections, Greg required him to continue working in the face of the known risk. In *Howard v. Columbus Prod. Co.* (1992), 82 Ohio App.3d 129, 135, 611 N.E.2d 480, 484, the court held:

"[W]here an employer is expressly warned that a device is unsuitable for its intended use in a process or system which is already known to be dangerous, and the employer installs the device despite this knowledge, the employer may be treated as if it desired the harm which results from its conduct. Such a showing satisfies the first two prongs of the *Fyffe* test."

The difficulty in measuring the question of intent or the employer's knowledge of conditions that are substantially certain to cause harm was well described in *Richie v. Rogers Cartage Co.* (1993), 89 Ohio App.3d 638, 644, 626 N.E.2d 1012, 1016:

"The difficult issue in any employer intentional tort case is the degree of risk the employer can take before its conduct is legally considered to be, or can legally be inferred to be, an intentional act to injure. The employee need not prove that the employer had an actual subjective intent to cause the injury sustained or that the employer knew that the exact injury sustained would occur. *[Fyffe]* at 117, 570 N.E.2d at 1111. However, the mere knowledge and appreciation of a risk is not enough. *Id.*, paragraph two of the syllabus. The employee must prove that the employer knew that because of the exact danger posed, the employee would be harmed in some manner similar to the injury sustained or that the employer knew that because of the exact danger posed, it was highly probable (substantial-

ly certain) that the employee would be harmed in some manner similar to the injury sustained. *Id.*

"What constitutes a 'substantially certain' result will vary from case to case based on the facts involved. As the Supreme Court noted in *Van Fossen v. Babcock & Wilcox Co., supra*, 36 Ohio St.3d at 117, 522 N.E.2d at 504:

" 'There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved. Such conduct may be characterized as gross negligence or wantonness on the part of the employer. However, in view of the overall purposes of our Workers' Compensation Act, such conduct should not be classified as an "intentional tort" * * *.'

"Therefore, the intentional tort cause of action is limited to egregious cases. *Sanek v. Duracote Corp.* [1989], *supra*, 43 Ohio St.3d [169] at 172, 539 N.E.2d [1114] at 1117."

Giving credence to the evidence most favorable to the judgment below, we find that this is one such egregious case. Here, the employer was alerted to the dangerous condition of the rope, knew it was bad, but failed to procure another rope to avoid downtime. Defendant was aware of the exact danger of using the weakened rope in the rigging. In a recent case involving far less *scienter*, this court found a jury question was presented in *Reese v. Euclid Cleaning Contrs., Inc.* (1995), 103 Ohio App.3d 141, 658 N.E.2d 1096. This court found that a window-cleaning company could be found to have compelled the plaintiff to work knowing there was a defective safety belt. In affirming the denial of a directed verdict, this court stated, *per curiam*, at 146–147, 658 N.E.2d at 1099:

"According to the evidence produced at trial, ECC knew that the safety belt in question was twenty-eight years old and would eventually break. ECC knew that the safety belt would have to be used at Regina High School. Although ECC argues that William Reese could have refused to do belt work, no evidence was presented to indicate that the Regina High School job could have been completed without the use of safety belts. ECC knew that a window washer would be seriously injured or killed if a belt failed while it was in use. Nevertheless, ECC had no program to inspect or safety test the belts and continued to send its employees on jobs which required their use. Construing this evidence most strongly in favor of Reese, we find that reasonable minds could reach different conclusions about whether ECC's actions constituted an intentional tort."

In the safety-belt case, a mere failure to inspect and retire overage belts was reason enough to find an intentional tort. In the instant case, the defective rope

was pointed out to the employer shortly before the accident. The rope in question was the sole support of the scaffold on which plaintiff was required to work. The court's ruling was supported by the weight of the evidence. See *Santill v. Gen. Elec. Co.* (Apr. 4, 1991), Cuyahoga App. No. 58377, unreported, 1991 WL 45559.

Defendant argues vigorously, however, that it was the plaintiff's own conduct that was the proximate cause of his injury, because he failed to use the safety devices that would have prevented his free fall and he could have refused to expose himself to the dangerous condition in the first instance by not going up on the scaffold.

There was testimony from plaintiff in the record that he was concerned that if he refused the assignment he would be fired. There was also evidence on both sides as to who was required to bring the rope-grabs to the job site—the employer or employee.

The Ohio Supreme Court held in *Cremeans v. Willmar Henderson Mfg. Co.* (1991), 57 Ohio St.3d 145, 566 N.E.2d 1203, that assumption of risk and contributory negligence are not defenses to an intentional tort claim. The syllabus states:

"An employee does not voluntarily or unreasonably assume the risk of injury which occurs in the course of his or her employment when that risk must be encountered in the normal performance of his or her required job duties and responsibilities."

In *dicta,* the Supreme Court also pointed out in *Cremeans* "that the [proximate] cause of Cremeans's injury is a jury question." *Id.* at 151, 566 N.E.2d at 1209. Since there may be more than one proximate cause of an injury, we cannot say under the peculiar circumstances of this case that the trial court erred as a matter of law in finding the employer's conduct to be the proximate cause of the fall and injury. Even if a rope-grab would have prevented the free fall, there was some evidence that it was the employer's obligation to supply rope-grabs at the job site and it failed to do so.

Assignments of Error I, II, IV and V are overruled.

"III. The trial court erred to the prejudice of the defendant-appellant in admitting certain documentary evidence over the objection of defendant-appellant in that said evidence was irrelevant and incompetent, and designed only to prejudice the defendant-appellant."

This was a trial to the bench. The admission or exclusion of evidence is a matter within the sound discretion of the trial court and will not be second-guessed in the absence of an abuse of discretion. We find no prejudicial error in the trial court's admission of evidence which reflected on defendant's failure to

observe safety codes or industry practices. We trust that the trial judge, as the factfinder, would be able to sort out the irrelevant and prejudicial evidence from that which was probative and admissible. *State v. Fox* (1994), 69 Ohio St.3d 183, 189, 631 N.E.2d 124, 129 ("judges are presumed in a bench trial to rely only upon relevant material and competent evidence").

This assignment of error is overruled.

"VI. The trial court erred to the prejudice of defendant-appellant in not granting defendant–appellant's written demand for a jury trial."

██ This assignment of error is without merit. The parties had stipulated off the record as to the waiver of a jury trial. The court made mention to that effect before the trial started and neither party objected. The defendant cannot stand idly by and invite error by inaction. It was obliged to preserve its right to a jury trial by objection and preserve the error every step of the way on the record. *Yackel v. Kay* (1994), 95 Ohio App.3d 472, 479, 642 N.E.2d 1107, 1111 ("an appellate court will not consider issues which the appellant failed to raise in the trial court"); *Boewe v. Ford Motor Co.* (1992), 94 Ohio App.3d 270, 279, 640 N.E.2d 850, 855. Defendant did not make its objection known and willingly participated in the bench trial.

This assignment of error is overruled.

*Judgment affirmed.*

JAMES D. SWEENEY, P.J., and BLACKMON, J., concur.