[Cite as *Horanyi v. Shooter Constr. Co.*, 2011-Ohio-4164.]

## IN THE COURT OF APPEALS OF OHIO
### SECOND APPELLATE DISTRICT
### MONTGOMERY COUNTY

JOHN A. HORANYI, JR.            :

                                 :         Appellate Case No.   23876

       Plaintiff-Appellant        :

                                 :         Trial Court Case No.   08-CV-6213

v.                            :

                                 :

SHOOTER CONSTRUCTION CO.,    :      (Civil   Appeal from
dba POSSERT CONSTRUCTION CO.  :       Common Pleas Court)

                                 :

       Defendant-Appellee      :

                                 :

. . . . . . . . . .

### O P I N I O N

Rendered on the 19th day of August, 2011.

. . . . . . . . .

A. MARK SEGRETI, JR. Atty. Reg. #0009106, 1405 Streamside Drive, Dayton, Ohio 45459
and
DAVID G. ROACH, Atty. Reg. #0031977, 251 West Central Avenue, Suite 108, Springboro,
Ohio 45066
      Attorneys for Plaintiff-Appellant

CRAIG T. MATTHEWS, Atty. Reg. #0029215, 320 Regency Ridge Drive, Centerville, Ohio
45459
and
CHRISTOPHER F. JOHNSON, Atty. Reg. #0005240, Freund, Freeze & Arnold, 1800 One
Dayton Center, 1 South Main Street, Dayton, Ohio 45402
      Attorneys for Defendant-Appellee

. . . . . . . . .

HALL, J.

{¶ 1}   John A. Horanyi, Jr., appeals from the trial court's entry of summary judgment

against him and in favor of appellee Shooter Construction Company, dba Possert Construction

Company ("Possert"), in this employer intentional tort action.

{¶ 2}   Horanyi advances two assignments of error on appeal. First, he contends the trial court erred in entering summary judgment in favor of Possert when genuine issues of material fact remain for trial. Second, he claims the trial court erred in striking his expert witness's affidavit based on a lack of personal knowledge and a failure to set forth facts or data supporting the expert's opinions.

{¶ 3}   The present appeal stems from injuries Horanyi sustained when he fell while restoring a single-story ranch home. At the time of the accident, he was employed by Possert as a carpenter. He was working as part of a four-man crew erecting wooden trusses on top of eight-foot walls. The initial step in the process involved hand-stacking the trusses horizontally on top of the house frame. After the trusses were stacked, two crew members began pushing them upright while standing on six-foot stepladders. Horanyi and another crew member initially assisted from the ground, pushing the trusses upright with two-by-fours. The workers started at one end of the house and nailed each of the first two trusses into place to keep it vertical.

{¶ 4}   In his deposition, Horanyi explained that once the first two trusses were erected, they needed to be "tied in" or braced together near their peak for stability. (Horanyi depo. at 60-62). At the suggestion of a co-worker, Horanyi performed this task by climbing from a stepladder up into the middle of the trusses and straddling them. He remained in the trusses, climbing from one truss to the next to brace them after his co-workers pushed them upright and side-nailed them into place near the bottom. (Id. at 63-68, 72). According to Horanyi, there was no other way for the trusses to be braced because the area where the tie-in braces went could not be accessed from the available six-foot stepladders. (Id. at 62-63,

67-68). Horanyi estimated that he was working sixteen to eighteen feet above the ground when he fell. (Id. at 79).

{¶ 5}  After erecting and bracing a number of the trusses, the workers took a lunch break. When they returned, Horanyi resumed his position straddling the trusses near the peak. He and his co-workers installed all of the trusses but the last one, which was an end-wall truss. The record contains diverging accounts about what happened next. In his complaint, Horanyi alleged that he fell while "walking across a roof truss." In his deposition, however, he stated that he was straddling the next-to-last truss when he fell. He explained that "the wind or something" caused the end-wall truss to break  loose while he was trying to brace it. He "was lean[ing] over nailing the brace [when] the whole wall collapsed and took [him] with it." (Id. at 76). Finally, an accident report signed by Horanyi's co-workers who witnessed his fall described the incident as follows: "John Horanyi was on the top plate attempting to kick the heel of the gable-end truss into position when it went too far and started to fall. John grabbed the end truss while holding on to the second truss. His momentum (John is 6' 8" and weighs 265 pounds) pulled the second truss loose at the peak causing him to fall to the ground."

{¶ 6}  In any event, Horanyi commenced the present lawsuit against Possert after the accident. Following discovery, Possert moved for summary judgment, arguing that Horanyi could not establish an employer intentional tort under *Fyffe v. Jeno's, Inc*. (1991), 59 Ohio St.3d 115. In support of its motion, Possert cited various depositions and provided an affidavit from a construction industry expert witness. Horanyi opposed the motion, also citing depositions and relying largely on an affidavit from his own expert witness. Possert subsequently moved to strike parts of the affidavit provided by Horanyi's expert. In a June 18, 2009 decision, order, and entry, the trial court sustained Possert's motion to strike and the

company's motion for summary judgment. This appeal followed.

{¶ 7}   In his first assignment of error, Horanyi challenges the trial court's decision to strike portions of the affidavit provided by Ralph Reel, his expert witness. In his affidavit, Reel, who identified himself as a "senior safety consultant," averred as follows:

{¶ 8}   "2. As an OSHA compliance officer, I investigated hundreds of accidents and work sites to make determination whether or not employers such as Possert Construction Company were complying with OSHA safety standards and their own company safety policies and fall protection programs. This obviously included fall protection at heights greater than 6 feet.

{¶ 9}   "3. During my years at General Motors Corporation, I worked as a Safety Engineer. I would, on a daily basis, be responsible for evaluating, recognizing, and enforcing safe work practices for a plant with thousands of employees and thousands of square feet. This included preventing falls from heights, tripping or other walk surface accidents. It also obviously included fall protection recognition and enforcement.

{¶ 10} "4. Currently, I continue to work for numerous companies to bring them into OSHA compliance and to insure that they are with adequate fall protection programs. This includes new plant set-ups and implementation of safety programs. This includes all aspects of appropriate fall protection.

{¶ 11} "5. I have reviewed the following depositions in the John Horanyi case: John A. Horanyi, Christopher K. Jones, Gregory Kenneth Shooter, John Russell Manz, and Gary Jerome Shooter.

{¶ 12} "6. All of the opinions expressed in this affidavit are within reasonable safety

engineering certainty.

{¶ 13} "7. At the time of his accident John Horanyi needed fall protection to prevent injury.

{¶ 14} "8. The employer knew of a dangerous procedure or condition that it was exposing its workers to. The employer knew they were working at heights, which in and of itself is dangerous and even more hazardous due to their failure to provide fall protection to John Horanyi. Testimony by Possert's own management establishes that they knew John Horanyi was performing work that required fall protection to prevent injury.

{¶ 15} "9. The employer knew an injury was substantially certain to occur due to their refusal to provide fall protection and enforce their own fall protection plan for the benefit of their worker, John Horanyi. Possert Construction was required to follow OSHA standards and knew that John Horanyi would be injured by not only their failure to apply OSHA safety standards, but their own fall protection program.

{¶ 16} "10. Possert Construction's failure to provide fall protection and enforce their fall protection plan was the cause of John Horanyi's fall and injuries."

{¶ 17} The trial court struck paragraphs eight and nine of Reel's affidavit, finding that his opinions about what Possert knew "are purely speculative and appear to be based solely upon his review of the depositions in this case." The trial court then struck paragraphs seven and ten based on Reel's failure to set forth any underlying facts to support the opinions in those paragraphs.

{¶ 18} With regard to paragraphs eight and nine, Horanyi argues on appeal that Reel was not required to have personal knowledge about what Possert knew. Horanyi contends an

expert witness may opine about the ultimate issue in an employer intentional tort case (such as what an employer knew) based on a review of depositions. As for paragraphs seven and ten, Horanyi insists that an expert witness is not required to set forth in an affidavit the facts upon which his opinions are based.

{¶ 19} Having reviewed the record, we see no need to debate whether the trial court abused its discretion in striking portions of Reel's affidavit. Although the stricken paragraphs have the appearance of notarized legal argument, our de novo review of the trial court's summary judgment ruling convinces us that Possert was entitled to summary judgment even taking into consideration the disputed paragraphs. Cf. *Spaeth v. General Acc. Ins. Co.* (July 26, 1995), Montgomery App. No. 14749 (declining to decide whether the trial court erred in striking an entire affidavit where the defendant was "entitled to summary judgment in its favor even with consideration of those averments in [the] affidavit of specific facts concerning which [the affiant was] competent to testify"). Accordingly, we will proceed directly to Horanyi's second assignment of error, which challenges the trial court's determination that his intentional tort claim failed as a matter of law.

{¶ 20} As noted above, we review the trial court's decision to grant summary judgment de novo. *Helton v. Scioto Cty. Bd. of Commrs.* (1997), 123 Ohio App.3d 158, 162. Summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion is made. *State ex rel. Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183. To establish an intentional-tort claim against an employer, an employee must

demonstrate: (1) that the employer had knowledge of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) that the employer had knowledge "that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty"; and (3) "that the employer under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." *Fyffe*, supra, at paragraph one of the syllabus.[1]

{¶ 21} It is well settled that an employer intentional tort claim requires proof beyond that required to establish negligence or recklessness. "Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, mere knowledge and appreciation of a risk–something short of substantial certainty–is not intent." Id. at paragraph two of the syllabus. Because the applicable standard is exceedingly difficult to satisfy, "[t]he intentional tort cause of action is limited to egregious cases." *Sanek v. Duracote Corp*. (1989), 43 Ohio St.3d 169, 172.

---

[1] Effective April 7, 2007, R.C. 2745.01 modified the *Fyffe* test by defining "substantially certain" to mean "an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death." The Ohio Supreme Court has recognized that "R.C. 2745.01 is not retroactive and, therefore, has no effect on employees whose causes of action arose before the statute's effective date and whose claims have vested." *Stetter v. R.J. Corman Derailment Servs., L.L.C.*, 125 Ohio St.3d 280, 290, 2010-Ohio-1029. In the present case, Horanyi's injury occurred in 2001. Therefore, we will apply the *Fyffe* test.

**{¶ 22}** With the foregoing standards in mind, we turn now to the evidence before us. Construed most strongly in Horanyi's favor, the record reveals that he was straddling the next-to-last truss and attempting to brace it to the end-wall truss when he fell. Horanyi was working sixteen to eighteen feet above the ground, too high to access the trusses from the six-foot step ladders Possert had provided. (Horanyi depo. at 62-63, 67-68, 79). The trusses had to be braced by nailing them at the top, and no alternative way of bracing the trusses existed. (Id. at 79). Earlier that day, when Horanyi had expressed concerns to his Possert supervisor, Chris Jones, about being required to work at heights, Jones had responded by telling the work crew to erect the trusses "[a]ny way you can." (Id. at 68-69). When Horanyi inquired about using a crane and safety harnesses, Jones said they were not necessary, adding, "[I]f you don't like it, you can always go home." (Id. at 28).

**{¶ 23}** Although Possert asserts on appeal that it disallowed employees working from the "top plate" or climbing into the trusses, the record contains evidence indicating otherwise.[2] John Manz, another Possert manager at the time of Horanyi's fall, testified that it was acceptable for a person bracing trusses to work "up on the peak to tie them together, brace them off." (Manz depo. at 12). According to Manz, it was acceptable at Possert for such a person to work "inside the trusses on the webs" without being confined to a ladder. (Id. at 12-13, 15-17).

**{¶ 24}** In a written fall-protection plan, Possert itself recognized that employees sometimes needed to work "in the webs" when bracing trusses. (Doc. #26, Exh. 2, at 17). Similarly, although the federal Occupational Safety and Health Administration (OSHA)

---

[2] The "top plate" is the top edge of a house's frame upon which the trusses sit. (Jones depo. at 22).

"encourages employers to require their employees to work from ladders, scaffolds and other platforms rather than for example, walking the top plate when setting or bracing trusses," the agency recognizes that employees may need to work above the ladders. See 59 Fed. Reg. 152 (Aug. 9, 1994). OSHA requires such employees to be protected by "conventional fall protection systems unless they are covered by a fall protection plan which specifies other alternative measures." Id.

{¶ 25} In order to assist employers, OSHA has drafted a sample fall-protection plan that contains "non-mandatory guidelines." See 29 C.F.R. 1926, Subpart M, Appendix E. Notably, the pertinent language of Possert's fall-protection plan seems to adopt OSHA's sample plan because the language is identical to OSHA's sample plan. In relevant part, Possert's fall-protection plan states:

{¶ 26} "This Fall Protection Plan addresses the use of conventional fall protection at a number of areas on the project, as well as identifies specific activities that require non-conventional means of fall protection. During the construction of residential buildings under 48 feet in height, it is sometimes infeasible or it creates a greater hazard to use conventional fall protection systems at specific areas or for specific tasks. The areas or tasks may include, but are not limited to:

{¶ 27} "a. Setting and bracing of roof trusses and rafters;

{¶ 28} "b. Installation of floor sheathing and joists;

{¶ 29} "c. Roof sheathing operations; and

{¶ 30} "d. Erecting exterior walls.

{¶ 31} "In these cases, conventional fall protection systems may not be the safest

choice for builders. This plan is designed to enable employers and employees to recognize the fall hazards associated with this job and to establish the safest procedures that are to be followed in order to prevent falls to lower levels or through holes and openings in walking/working surfaces.

**{¶ 32}** "* * *

**{¶ 33}** "Installation of roof trusses/rafters, exterior wall erection, roof sheathing, floor sheathing and joist/truss activities will be conducted by employees who are specifically trained to do this type of work and are trained to recognize the fall hazards. The nature of such work normally exposes the employee to the fall hazard for a short period of time. This Plan details how Possert Construction Company will minimize these hazards.

**{¶ 34}** "* * *

**{¶ 35}** "During the erection and bracing of roof trusses/rafters, conventional fall protection may present a greater hazard to workers. On this job, safety nets, guardrails and personal fall arrest systems will not provide adequate fall protection because the nets will cause the walls to collapse, while there are no suitable attachment or anchorage points for guardrails or personal fall arrest systems.

**{¶ 36}** "On this job, requiring workers to use a ladder for the entire installation process will cause a greater hazard because the worker must stand on the ladder with his back or side to the front of the ladder. While erecting the truss or rafter the worker will need both hands to maneuver the truss and therefore cannot hold onto the ladder. In addition, ladders cannot be adequately protected from movement while trusses are being maneuvered into place. Many workers may experience additional fatigue because of the increase in overhead

work with heavy materials, which can also lead to a greater hazard.

**{¶ 37}** "Exterior scaffolds cannot be utilized on this job because the ground, after recent backfilling, cannot support the scaffolding. In most cases, the erection and dismantling of the scaffold would expose workers to a greater fall hazard than erection of the trusses/rafters.

**{¶ 38}** "On all walls eight feet or less, workers will install interior scaffolds along the interior wall below the location where the trusses/rafters will be erected. 'Sawhorse' scaffolds constructed of 46 inch sawhorses and 2x10 planks will often allow workers to be elevated high enough to allow for the erection of trusses and rafters without working on the top plate of the wall.

**{¶ 39}** "* * *

**{¶ 40}** "Possert Construction Company shall take the following steps to protect workers who are exposed to fall hazards while working from the top plate installing trusses/rafters:

**{¶ 41}** "*only the following trained workers will be allowed to work on the top plate during roof truss or rafter installation:

_____

_____

_____

**{¶ 42}** "*workers shall have no other duties to perform during truss/rafter erection procedures;

**{¶ 43}** "*all trusses/rafters will be adequately braced before any worker can use the

truss/rafter as a support;

**{¶ 44}** "*workers will remain on the top plate using the previously stabilized truss/rafter as a support while other trusses/rafters are being erected;

**{¶ 45}** "*workers will leave the area of the secured trusses only when it is necessary to secure another truss/rafter;

**{¶ 46}** "*the first two trusses/rafters will be set from ladders leaning on side walls at points where the walls can support the weight of the ladder; and

**{¶ 47}** "*a worker will climb onto the interior top plate via a ladder to secure the peaks of the first two trusses/rafters being set.

**{¶ 48}** "The workers responsible for detaching trusses from cranes and/or securing trusses at the peaks traditionally are positioned at the peak of the trusses/rafters. There are also situations where workers securing rafters to ridge beams will be positioned on top of the ridge beam.

**{¶ 49}** "Possert Construction Company shall take the following steps to protect workers who are exposed to fall hazards while securing trusses/rafters at the peak of the trusses/ridge beam:

**{¶ 50}** "*only the following trained workers will be allowed to work at the peak during roof truss or rafter installation:

_____

_____

_____

**{¶ 51}** "*once truss or rafter installation begins, workers not involved in that activity

shall not stand or walk below or adjacent to the roof opening or exterior walls in any area where they could be struck by falling objects;

{¶ 52} "*workers shall have no other duties than securing/bracing the trusses/ridge beam;

{¶ 53} "*workers positioned at the peaks or in the webs of trusses or on top of the ridge beam shall work from a stable position, either by sitting on a 'ridge seat' or other equivalent surface that provides additional stability or by positioning themselves in previously stabilized trusses/rafters and leaning into and reaching through the trusses/rafters;

{¶ 54} "*workers shall not remain on or in the peak/ridge any longer than necessary to safely complete the task." (Doc. #26, Exh. 2, at 14-17).

{¶ 55} Based on the foregoing evidence, a trier of fact reasonably could find that Possert knew of a dangerous procedure within its business operation. In its own fall-protection plan, the company recognized that employees sometimes were required to work near the peaks of trusses to secure them. Moreover, through its site supervisor, Chis Jones, Possert had constructive knowledge that Horanyi was straddling trusses near the peak, without any traditional fall protection and without interior scaffolding, which was included in the company's fall-protection plan as an alternative to traditional fall protection.[3] See *Jandro v.*

---

[3] We recognize that the presence of scaffolding here would not have eliminated the need for Horanyi to work in the webbing of the trusses. Any interior scaffolding could not have been higher than the structure's eight-foot walls. Therefore, it would not have been high enough for Horanyi to stand on and reach the area where he was bracing the trusses. Construing the evidence in a light most favorable to Horanyi, however, there could be a potential safety benefit to Horanyi. Depending on specifically how and where he landed, Horanyi may have landed on the scaffolding, if it had been present, thereby reducing the distance of his fall and the extent of his harm. Notably, Possert employee Dale Jackson testified that one of the purposes of using scaffolding was "so that if anyone was to fall, they would stop within the six, eight feet limit" by "[c]reat[ing] a barrier between the bottom of the trusses and the ground." (Jackson depo. at 16).

*Ohio Edison Co.* (C.A.6, 1999), 167 F.3d 309, 315 ("It is beyond dispute in this case that Roger Adams, the foreman, and Jim Swank, the project supervisor, were acting with the apparent authority of [the employer]. Because both Swank and Adams were necessarily aware of these safety violations, [the employer] was constructively aware of them. For the purpose of this opinion, we will therefore assume that the estate has satisfied its burden under the first prong of the *Fyffe* test."); see, also, *Stump v. Industrial Steeplejack Co.* (1995), 104 Ohio App.3d 86, 91-92. Therefore, a genuine issue of material fact exists on the first element of the *Fyffe* test.

**{¶ 56}** We reach a different conclusion, however, regarding *Fyffe's* second element. We see no genuine issue of material fact as to whether Possert knew Horanyi was substantially certain to be harmed by performing his work on the day in question. In his affidavit opposing summary judgment, Horanyi's expert, Ralph Reel, averred as follows regarding Possert's knowledge:

**{¶ 57}** "The employer knew an injury was substantially certain to occur due to their refusal to provide fall protection and enforce their own fall protection plan for the benefit of their worker, John Horanyi. Possert Construction was required to follow OSHA standards and knew that John Horanyi would be injured not only by their failure to apply OSHA safety standards, but their own fall protection program." (Doc. #26, Reel affidavit, ¶9).

**{¶ 58}** Upon review, we conclude that Reel's affidavit fails to create a genuine issue of material fact on the substantial-certainty issue. As a threshold matter, a conclusory averment that Possert violated unspecified "OSHA safety standards" does not create a genuine issue of material fact. Moreover, as explained above, Possert's fall-protection plan was intended by OSHA to serve as a substitute for traditional fall protection. Therefore, we see no

genuine issue of material fact based on Possert's failure to provide traditional fall protection.[4]

{¶ 59} With regard to its fall-protection plan, Possert could have been required to have interior scaffolding installed below where the trusses were erected. Although this was not done, the absence of scaffolding does not create a genuine issue of material fact as to whether Possert knew Horanyi was substantially certain to be injured by working in the webbing of the trusses. We reach this conclusion for at least two reasons. First, the use of scaffolding would not have eliminated the need for Horanyi to climb into the trusses and, therefore, would have done nothing to prevent his fall. The presence or absence of scaffolding simply had no impact on the probability of Horanyi falling. See footnote three, supra. Second, it is undisputed, of course, that Horanyi would not have been injured if he had not fallen. In this regard, we find noteworthy the undisputed evidence that since Possert's inception in 1989 none of its employees, other than Horanyi, "have injured themselves or fallen while setting and bracing trusses." (Doc. #19, Shooter affidavit, at ¶8). This is so despite the fact that Possert permits employees to work "inside the trusses on the webs." (Manz depo. at 12-13, 15-17). Although the absence of a prior accident is not dispositive, we cannot ignore the fact that no other Possert employee ever has fallen while performing the task that led to Horanyi's injury. This suggests that Possert had no reason to believe Horanyi would fall either, regardless of any fall protection that was not provided.

{¶ 60} We note too that Possert's fall-protection plan delineated specific requirements

---

[4]In his deposition, Horanyi primarily complained about the absence of a crane to lift the trusses into position. The record reveals, however, that cranes are unnecessary and not traditionally used when raising the relatively small trusses required to build a one-story house. In any event, the trusses already had been lifted into position when Horanyi fell. Horanyi also mentioned the absence of a fall restraint. Once again, however, the record reveals that traditional fall restraints do not work well when bracing trusses. There is simply nothing overhead upon which to anchor a fall restraint.

"to protect workers who are exposed to fall hazards while securing trusses/rafters at the peak of the trusses/ridge beam." We see no evidence indicating non-compliance with those particular requirements, which we quoted above. For present purposes, perhaps the most relevant requirement stated:"[W]orkers positioned at the peaks or in the webs of trusses or on top of the ridge beam shall work from a stable position * * * by positioning themselves in previously stabilized trusses/rafters and leaning into and reaching through the trusses/rafters." This is what Horanyi admitted he was doing when he fell. The fact that Possert enacted specific requirements to protect workers in Horanyi's position, and the fact that Horanyi appears to have followed those requirements, further militates against any inference that Possert knew, with substantial certainty, that Horanyi would fall and be injured.

{¶ 61} Finally, we have found no factual evidence in the record to support a contrary inference regarding Possert's substantial certainty that Horanyi would fall and be injured. Although Reel opined that the company "knew an injury was substantially certain to occur," this Court has held that a genuine issue of material fact arises from such opinion testimony only if a plaintiff presents some factual evidence to support the expert's conclusion. *Pennsylvania Lumbermens Ins. Corp. v. Landmark Electric, Inc*. (1995), 110 Ohio App.3d 732, 739; see, also, *Warren v. Libbey Glass, Inc*., Lucas App. No. L-09-1040, 2009-Ohio-6686, ¶38, quoting *Tablack v. Bd. of Mahoning Cty. Commrs*., Mahoning App. No. 07 MA 197, 2008-Ohio-4804, ¶47 ("'Expert testimony can be used to establish the necessary elements in an employer intentional tort case. However, simply because an expert concludes that an accident is substantially certain to occur does not necessarily establish that element as a legal conclusion. The expert's opinion must create a genuine issue of material fact from a legal standpoint.'"). Here, Reel based his expert opinion regarding substantial

certainty on deposition testimony from other witnesses, but we have found no facts in those depositions to support his conclusion. Accordingly, his affidavit fails to create a genuine issue of material fact for trial. Horanyi's second assignment of error is overruled.

**{¶ 62}** The judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . . .

DONOVAN, J., concurs.

FROELICH, J., dissenting:

**{¶ 63}** Although the facts as ultimately found by a jury may not be close, I believe a summary judgment is not appropriate.

**{¶ 64}** I agree with the majority that the defendant/movant met its burden of pointing to evidence that, if believed, affirmatively demonstrates that the plaintiff/non-movant has no evidence which would support his claim of an intentional tort. However, I would find that the plaintiff/non-movant met his reciprocal burden of pointing to evidence that, if believed, demonstrates genuine issues of material fact.

**{¶ 65}** Obviously there is evidence that the defendant/appellee knew that working off the ground (whether eight feet or sixteen feet) was dangerous; why else would it have adopted such a complete Fall Protection Plan other than to minimize the dangers and to protect its workers from falling.

**{¶ 66}** The second *Fyffe* element, whether there was a substantial certainty that plaintiff/appellant would be harmed that day, is, by definition, a conclusion. There does not have to be, and there is no contention in this case that there is, an actual, thought-out, subjective intent and desire to injure the employee - - that would be a criminal offense.

Rather, the evidence, if believed, must establish more than negligence or recklessness on the part of the employer.[5]

{¶ 67} There are facts in dispute in this case. There are various versions of exactly what the plaintiff/appellant was doing at the time he fell (walking across tresses or straddling the next-to-last truss or leaning over nailing the brace or kicking the heel of the truss) and what caused the fall (the "wind or weather" caused the truss to break loose while the plaintiff was trying to brace it or plaintiff was kicking it into position when it went too far).

{¶ 68} If believed, plaintiff/appellant voiced concerns about working without a crane and was told to get the job done "anyway you can." After the trusses were dropped off, plaintiff/appellant told the foreman that he had never put up trusses without a crane. The plaintiff/appellant was allegedly told that this was a small house and he could "just hold them [the trusses] up" and that "if you don't like it, you can always go home." Plaintiff/appellant then requested harnesses and was told they were not needed and that "if you get these done tomorrow, you'll be paid a bonus."

{¶ 69} It is true that much of the plaintiff/appellant's expert's affidavit consists of his conclusory opinions and is based on the depositions, but in that regard it is not legally distinguishable from the affidavit of the expert of the defendant/appellee, which had the initial burden. And its (the Appellee's) expert opines that "the Fall Protection Plan is nonetheless irrelevant;" rather he assesses fault on the plaintiff/appellant who "elected to climb into the webbing of the trusses" - whereas there is other evidence that it was acceptable to work

---

[5]Professor Prosser stated that intention under tort law "is not necessarily a hostile intent, or desire to do any harm. Rather it is an intent to bring about a result that will invade the interest of another in a way that the law forbids." Prosser and Keeton on the Law of Torts 36 (W.Page Keeton et al. eds Fifth Ed. 1984).

"inside the trusses on the web."

{¶ 70} It is certainly frustrating for an employee to be injured as a result of what he believes is not his fault, and not to be able to have his day in court; as it is exasperating for the employer to take what it believes are all necessary safety precautions and still have to incur legal expenses, disrupt regular business activities, and risk an adverse award. However, given the centrality of the jury system, courts should err on the side of admitting expert testimony at the summary judgment stage, see, e.g., *Miller*, The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding our Day in Court and Jury Commitments? 78 N.Y.U.L. Rev. 982 (June 2003), and allowing the jury to decide cases when facts and conclusions are arguably in dispute.

. . . . . . . . . .

Copies mailed to:

A. Mark Segreti, Jr.
David G. Roach
Craig T. Matthews
Christopher F. Johnson
Hon. Mary K. Huffman

.